IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-0363

_____

**FILED**

**April 10, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE K.H.

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Carrie Webster, Judge
Civil Action No. 07-FIG-142

AFFIRMED IN PART; REVERSED IN PART; AND
REMANDED WITH DIRECTIONS

_____

Submitted: January 28, 2015
Filed: April 10, 2015


Lyne Ranson, Esq.                          Allyson E. Hilliard, Esq.
Lyne Ranson Law Offices, LC                Swartz Law Offices, PLLC
Charleston, West Virginia                  St. Albans, West Virginia
Attorney for the Petitioner                Attorney for the Respondent



CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.
Justice BENJAMIN, deeming himself disqualified, did not participate in the decision of this case.  Judge NIBERT, sitting by temporary assignment.

SYLLABUS BY THE COURT

1.	""""The exercise of discretion by a trial court in awarding custody of a minor child will not be disturbed on appeal unless that discretion has been abused; however, where the trial court's ruling does not reflect a discretionary decision but is based upon an erroneous application of the law and is clearly wrong, the ruling will be reversed on appeal." Syllabus point 2, *Funkhouser v. Funkhouser*, 158 W.Va. 964, 216 S.E.2d 570 (1975), *superseded by statute on other grounds as stated in David M. v. Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989).' Syl. Pt. 1, *In re Abbigail Faye B.*, 222 W.Va. 466, 665 S.E.2d 300 (2008)." Syl. Pt. 2, *In re Antonio R.A.*, 228 W.Va. 380, 719 S.E.2d 850 (2011).

2.	"In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*." Syllabus, *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004).

3.	"In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972).

4. "A psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of *In the Interest of Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), that case is expressly modified." Syl. Pt. 3, *In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138 (2005).

5. "In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syl. Pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).

6. "A parent has the natural right to the custody of his or her infant child, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment

or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts." Syllabus, *Whiteman v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960).

Workman, Chief Justice:

This is an appeal by Glenna. H. (hereinafter "grandmother")[1] from an order of the Circuit Court of Kanawha County affirming an order of the family court terminating the grandmother's eight-year guardianship of her granddaughter, K.H. The family court granted full custody to Anthony B., the child's father (hereinafter "father") with no ongoing visitation granted to the grandmother. On appeal, the grandmother contends that the family court erred in failing to recognize her as the psychological parent of the child; failing to properly consider the child's best interests or material changes in circumstances; and failing to grant any ongoing visitation to the grandmother.

Subsequent to a thorough review of the appendix record, the parties' briefs, and oral arguments of counsel, this Court affirms the family court and circuit court orders terminating the grandmother's guardianship of the child, but we remand this matter with directions to the circuit court to remand to the family court for a hearing on the issue of visitation and the entry of an order granting liberal visitation rights to the grandmother, the specific contours of which are to be fashioned by the family court.

---

[1]Because this case involves sensitive facts, we protect the identities of those involved by using the parties' first names and last initials, and we identify the child by using her initials only. *See State ex rel. W.Va. Dept. of Human Servs. v. Cheryl M.*, 177 W.Va. 688, 689 n.1, 356 S.E.2d 181, 182 n.1 (1987).

I.  Factual and Procedural History

K.H. was born in June of 2006.  The father had no contact with the child during the first year of her life and requested multiple paternity tests.  He first saw the child on August 1, 2007.  The child's mother and brother died in an automobile accident on September 15, 2007, and the maternal grandmother, petitioner Glenna H., thereafter filed for guardianship of the child on September 27, 2007.  By order dated October 30, 2007, the family court appointed the grandmother as guardian of the child.  The father appeared at the guardianship hearing and did not object to the grandmother's appointment.

On November 6, 2008, the father filed a petition to establish custodial responsibility for the child.  This action resulted in an April 2009 agreed order granting primary custody to the grandmother with parenting time to the father every other weekend and one night per week.  The father also began paying child support.  On November 18, 2010, the father filed a petition to revoke or terminate the grandmother's guardianship.  This action resulted in a 2011 agreed order granting the father additional parenting time.  The father and grandmother also agreed to refrain from seeking further modification of the custody arrangements until December 31, 2012.

On January 16, 2013, the father filed another petition to terminate the

grandmother's guardianship of the child.[2]  By order dated April 11, 2013, Attorney Woody

Hill was appointed as the guardian ad litem for the child.  Subsequent to his investigation,

Mr. Hill opined that the child should be placed in the custody of the father.[3]  Mr. Hill

reported that he considered the child's best interests and determined that the father was

capable of providing a stable environment for the child, with no further need for

guardianship.

On July 16, 2013, the grandmother filed a motion with the family court seeking

to be designated as the child's "psychological parent" and also objected to the termination

of her guardianship of the child.  The family court held hearings in July, October, and

November, 2013.  In addition to the parties and the guardian ad litem, Dr. Timothy Saar, a

psychologist retained by the grandmother, testified that the grandmother and the child have

[2]The appendix record indicates that the father is employed by the State of West Virginia and pays his daughter's health insurance and private school tuition, fees, books, etc. He is also on active status in the National Guard and has ample room in his residence for the child.

[3]The guardian ad litem also reported that the grandmother had permitted the child to remain in the custody of her friend, Franklin Newsom, a few days a week.  Mr. Newsom is a seventy-six-year-old man who had served a sentence for marijuana distribution and had been convicted for making threats to murder an Assistant United States Attorney who had prosecuted him.  Mr. Newsom was also charged with battery in 1999 and DUI in 2011.  The DUI charges were later dismissed.  According to the father, the grandmother placed Mr. Newsom's name on school records as the contact individual and was reluctant to give the father access to the daughter's school records.  After the issues regarding Mr. Newsom's background were brought to the attention of the family court, the court entered an order prohibiting overnight visitation with Mr. Newsom and also prohibited Mr. Newsom from being alone with the child.

a significant bond and that the child honestly views the grandmother as "mom." Dr. Saar did

not meet with the father.[4]

By order dated December 18, 2013, the family court terminated the

grandmother's guardianship and denied her motion to be considered a psychological parent.

The grandmother appealed to the Circuit Court of Kanawha County on January 17, 2014.

The circuit court refused the appeal, and the grandmother thereafter appealed to this Court.

## II. Standard of Review

This Court has held that the standard of review in custody decisions, including

guardianships, is as follows:

> "'The exercise of discretion by a trial court in awarding
> custody of a minor child will not be disturbed on appeal unless
> that discretion has been abused; however, where the trial court's
> ruling does not reflect a discretionary decision but is based upon
> an erroneous application of the law and is clearly wrong, the
> ruling will be reversed on appeal.' Syllabus point 2, *Funkhouser
> v. Funkhouser*, 158 W.Va. 964, 216 S.E.2d 570 (1975),
> *superseded by statute on other grounds as stated in David M. v.
> Margaret M.*, 182 W.Va. 57, 385 S.E.2d 912 (1989)." Syl. Pt.
> 1, *In re Abbigail Faye B.*, 222 W.Va. 466, 665 S.E.2d 300
> (2008).

Syl. Pt. 2, *In re Antonio R.A.*, 228 W.Va. 380, 719 S.E.2d 850 (2011). We have also

---

[4]The family court order states that Dr. Saar did not draft or produce a report for the court.

4

explained as follows:

> In reviewing a final order entered by a circuit court judge upon a review of, or upon a refusal to review, a final order of a family court judge, we review the findings of fact made by the family court judge under the clearly erroneous standard, and the application of law to the facts under an abuse of discretion standard. We review questions of law *de novo*.

Syllabus, *Carr v. Hancock*, 216 W. Va. 474, 607 S.E.2d 803 (2004). Guided by these standards, we now consider the parties' arguments.

## III. Discussion

### A. West Virginia Code § 44-10-3, Best Interests, and Changed Circumstances

The grandmother asserts that the family court and lower court erred in the consideration of the father's petition to terminate the guardianship by failing to properly evaluate the best interests of the child and the existence of changed circumstances. In so arguing, the grandmother raises the issue of the legislative amendments to the requirements articulated in West Virginia Code § 44-10-3 that became effective between the father's filing of the petition for termination of the guardianship and the court's hearings on the matter.[5]

---

[5]The pre-July 9, 2013, version, the relevant portion of which was articulated in § 44-10-3(c)(4), provided as follows:

> (c) The court, the guardian or the minor may revoke or terminate the guardianship appointment when:

> (4) A petition is filed by the guardian, the minor,

The grandmother contends that the family court erred by applying the version of the statute in effect at the time of the filing, rather than the amended version. The primary distinction between the prior and amended versions is the addition of the requirement for consideration of the best interests of the child and a material change in circumstances supporting the need to terminate the guardianship.

---

> an interested person or upon the motion of the court stating that the minor is no longer in need of assistance or protection of a guardian.

The requirements of that guardianship statute were amended, effective July 9, 2013, approximately six months after the father's petition but before the hearings on the petition. That amended statute, in relevant portion, provides as follows:

> (i) The court, the guardian or the minor may revoke or terminate the guardianship appointment when:
>
>> (4) A petition is filed by the guardian, the minor, a parent or an interested person or upon the motion of the court stating that the minor is no longer in need of the assistance or protection of a guardian *due to changed circumstances and the termination of the guardianship would be in the minor's best interest*.
>
> (j) For a petition to revoke or terminate a guardianship filed by a parent, the burden of proof is on the moving party to show by a preponderance of the evidence that there has been a *material change of circumstances and that a revocation or termination is in the child's best interest*.

W.Va. Code § 44-10-3(i)(4) and 44-10-3(j) (emphasis supplied).

This Court's review of the record reveals that the family court recognized the existence of the statutory amendment in its order, but it did not specifically identify the statutory underpinnings for its conclusion that the grandmother's guardianship should be terminated. It simply stated that the father had filed his petition for termination under West Virginia Code § 44-10-3(c)(4), and it thereafter proceeded to articulate its findings. The family court did, however, address the issue of the best interests of the child and the change in circumstances that had gradually occurred in the father's level of participation in his daughter's life. The family court observed that "striking a balance between a biological parent's constitutional rights and the child's best interests can be difficult." The court also recognized the immeasurable importance of the child's best interests, as discussed by this Court in *In re Antonio.* 228 W.Va. at 388, 719 S.E.2d at 858. The court explained that the "record clearly reflects that throughout the years Father has continually stepped up to care for his child and has willingly assumed additional and substantial parental responsibilities as well as all caretaking functions for his minor daughter."

This Court finds the parties' arguments regarding deficiencies in the application of the statute to be unavailing. Beyond any statutory requirement for consideration of best interests and changed circumstances, this Court has emphatically declared the requirement for a thorough consideration of the best interests of the child and changed circumstances in all matters relating to altering custody of children. The substantive

7

law in effect at *both* the time of filing of the petition and the time of hearings on the matter required such consideration. This Court addressed these requirements in the specific context of a termination of guardianship in *In re Haylea G.*, 231 W. Va. 494, 745 S.E.2d 532 (2013), and has consistently required analysis of best interests and changed circumstances in matters involving custody of children. *Id.* at 498, 745 S.E.2d at 536. A child's best interests have been heralded as the paramount consideration by which all custody determinations should be made. We have repeatedly held that "[i]n a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 1, *State ex rel. Cash v. Lively*, 155 W.Va. 801, 187 S.E.2d 601 (1972) (internal citation omitted); *see also* Syl. Pt. 3, in part, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996) ("Although parents have substantial rights that must be protected, the primary goal . . . in all family law matters . . . must be the health and welfare of the children."); Syl. Pt. 5, *Carter v. Carter*, 196 W.Va. 239, 470 S.E.2d 193 (1996) ("In visitation as well as custody matters, we have traditionally held paramount the best interests of the child.").

We find that the family court, while not clearly specifying the statutory basis for its conclusions regarding termination of the guardianship, satisfactorily considered both K.H.'s best interests and the change in circumstances that had occurred over the several years in which the father's level of participation had increased. Moreover, the family court also considered the advice and conclusions of the guardian ad litem, formulated subsequent to a

8

thorough investigation. In his January 2015 update on the current status of the child, the guardian ad litem specifically informed this Court that the child reported a preference to live with her father and also expressed a desire to spend additional time with her grandmother. This Court finds neither clear error nor abuse of discretion in the family court's conclusion that the guardianship should be terminated and custody granted to the father.[6]

### B. Psychological Parent

The grandmother also contends that the family court and circuit court erred by failing to recognize her as the psychological parent of the child based upon her eight-year guardianship and the relational bonds created during that time. The "psychological parent" concept, as employed in this state, was originally associated with an individual's right to intervene in child custody matters pursuant to West Virginia Code § 48-9-103 (2014).[7] As

---

[6]The father contends that the grandmother raised this issue of erroneous application of the statute for the first time on appeal. The appendix record reveals, however, that the grandmother repeatedly argued that there had not been a change of circumstances and that termination of the guardianship was not in the child's best interest. This Court also notes the exception to the general rule of prospective statutory application, as addressed in *Shanholtz v. Monongahela Power Co.,* 165 W.Va. 305, 270 S.E.2d 178 (1980). "[W]here an amended statute incorporates common law that had existed before the amendment to the statute, the statute may be applied retroactively." *Myers v. Morgantown Health Care Corp.*, 189 W. Va. 647, 650, 434 S.E.2d 7, 10 (1993).

[7]The general legal principles associated with the psychological parent concept were addressed in a 1995 Wisconsin case, and the criteria enumerated in that four-element test have now become incorporated within the definitions of the psychological parent doctrine utilized by most reviewing courts. *See In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis.), *cert. denied sub nom. Knott v. Holtzman*, 516 U.S. 975 (1995). These four elements include the following:

9

enunciated in syllabus point three of *In re Clifford K.*, 217 W. Va. 625, 619 S.E.2d 138

(2005),

> A psychological parent is a person who, on a continuing day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills a child's psychological and physical needs for a parent and provides for the child's emotional and financial support. The psychological parent may be a biological, adoptive, or foster parent, or any other person. The resulting relationship between the psychological parent and the child must be of substantial, not temporary, duration and must have begun with the consent and encouragement of the child's legal parent or guardian. To the extent that this holding is inconsistent with our prior decision of *In the Interest of Brandon L.E.*, 183 W.Va. 113, 394 S.E.2d 515 (1990), that case is expressly modified.

In establishing those parameters for the psychological parent concept in *Clifford K.,* this

Court specifically warned:

> With the announcement of this holding we also wish to make it abundantly clear that the mere existence of a psychological parent relationship, in and of itself, does not automatically permit the psychological parent to intervene in a proceeding to

---

(1) that the biological or adoptive parent consented to, and fostered, the [third party's] formation and establishment of a parent-like relationship with the child; (2) that the [third party] and the child lived together in the same household; (3) that the [third party] assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the [third party] has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 421.

10

determine a child's custody pursuant to W. Va. Code § 48-9-103(b). Nothing is more sacred or scrupulously safeguarded as a parent's right to the custody of his/her child.

217 W. Va. at 644, 619 S.E.2d at 157; *see also* Syl. Pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973) ("In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions."); Syllabus, *Whiteman v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960) ("A parent has the natural right to the custody of his or her infant child, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts."). Recognizing the inherent rights of a biological parent to his or her child, this Court observed in *Clifford K.* that "the limited rights of a psychological parent cannot ordinarily trump those of a biological or adoptive parent to the care, control, and custody of his/her child." 217 W. Va. at 644, 619 S.E.2d at 157; *see also Honaker v. Burnside*, 182 W.Va. 448, 452, 388 S.E.2d 322, 325 (1989) (stating that "[a]lthough we recognize the attachment and secure relationship" between a child and a psychological parent, "such bond cannot alter the otherwise secure natural rights of a parent[.]").

This Court also addressed the concept of psychological parent in *In re Visitation & Custody of Senturi N.S.V.*, 221 W. Va. 159, 652 S.E.2d 490 (2007), and observed:

> In the cases in which this Court has determined a person to be a psychological parent to a child, that person typically has resided in the child's household and interacted with the child on a daily basis. *See, e.g., In re Clifford K., id.; In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996); *Simmons v. Comer*, 190 W.Va. 350, 438 S.E.2d 530 (1993); *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989). Moreover, a psychological parent is one who essentially serves as a second parent to a child and is a relationship to which the child's parent has consented. *See generally In re Clifford K.*, 217 W.Va. 625, 619 S.E.2d 138; *Simmons*, 190 W.Va. 350, 438 S.E.2d 530; *Honaker,* 182 W.Va. 448, 388 S.E.2d 322."

221 W.Va. at 167, 652 S.E.2d at 498. In *Senturi,* the Court was also deliberate in its recognition of the potential for the concept of psychological parent to be inappropriately extended.

> Obviously, a child will hold in high esteem any person who looks after him/her, attends to his/her needs, and lavishes him/her with love, attention, and affection. However, simply caring for a child is not enough to bestow upon a care giver psychological parent status. Were this the law of the State, any person, from day care providers and babysitters to school teachers and family friends, who cares for a child on a regular basis and with whom the child has developed a relationship of trust could claim to be the child's psychological parent and seek an award of the child's custody to the exclusion of the child's parent. Clearly, this is not the result contemplated by this Court's prior holding [in *Clifford K.*] . . . .

*Id.* at 168, 652 S.E.2d at 499.

12

This Court also exhibited reluctance to apply the psychological parent concept in a manner that would unnecessarily detract from the rights of the natural parents in *In re N.A.*, 227 W. Va. 458, 711 S.E.2d 280 (2011):

> Simply because a person is found to be a child's psychological parent, however, does not translate into the psychological parent getting custody of the child. Rather, this Court has only gone so far as to hold that the status of "psychological parent" entitles the individual to intervene in a custody proceeding, "when such intervention is likely to serve the best interests of the child(ren) whose custody is under adjudication." . . . Thus, custody determinations regarding a child or children are still controlled by what is in the best interests of the child(ren).

227 W.Va. at 469, 711 S.E.2d at 291 (quoting *Clifford K.*, 217 W.Va. at 640, 619 S.E.2d at 153).

This Court had occasion to speak to the psychological parent issue again in *In re Antonio.* In that case, the child's maternal grandmother had filed a petition for guardianship, and the child's biological mother had objected. In appealing the denial of her petition, the grandmother argued that she had been the psychological parent to the child for ten years. 228 W.Va. at 384, 719 S.E.2d at 854. This Court held that the statutory scheme granting a trial court discretion to appoint a nominee selected by a minor over the age of fourteen did not obligate the trial court to appoint the grandmother as guardian, over the mother's objection and absent a showing of the mother's unfitness. *Id.* at 388, 719 S.E.2d at 858. The grandmother in *Antonio* argued that she should be appointed as Antonio's

13

guardian. However, Antonio had been living with his mother for the three years preceding the filing of the guardianship petition. "While [the grandmother] might have been able to succeed under this theory during the approximately ten years that Antonio lived with her, at this point in time, this Court cannot find that [the mother] has voluntarily transferred or relinquished custody of Antonio." *Id.* at 392, 719 S.E.2d at 862.

The Court recognized Antonio's desire to have a continued relationship with his grandmother, and found that while the guardianship should be terminated, Antonio would be entitled to have visitation with his grandmother. In so ruling, this Court relied upon *Honaker* for the proposition that the best interests of the child may, in certain cases, necessitate visitation with other parties: "[a]lthough custody of minor child should be with the natural parent absent proof of abandonment or some form of misconduct or neglect, the child may have a right to continued visitation rights with the stepparent or half-sibling." 182 W.Va. at 451, 388 S.E.2d at 325, syl. pt. 2.

In *In re A.C.*, No. 13-1120, 2014 WL 2782131, at *1 (W. Va. Supreme Court, June 19, 2014) (memorandum decision), this Court affirmed the lower court's determination that a non-parent had served the role of a psychological parent and observed that the family court had

> made detailed findings regarding the child's living situation with Brooke B. in Kanawha County, detailing how, for example,

14

> Brooke B. maintained A.C.'s school papers, how A.C. celebrated holidays in the Kanawha County home, how friends of A.C. dropped her off at the home, how Brooke B.'s address was A.C.'s official school address, and how Brooke B.'s authority to give consent for medical treatment of A.C. was never challenged.

2014 WL 2782131, at *1. This Court affirmed the order appointing the psychological parent as the guardian and granted custody to the psychological parent while the biological father was incarcerated. *Id.*

In the case sub judice, the family court found that the grandmother was not the psychological parent of K.H. because she failed to satisfy the second two elements of the "psychological parent" test. Specifically, it found that her guardianship was only temporary and was not begun with the consent of the father. Upon review of the record, this Court finds that the family court clearly erred. The grandmother had custody of this child for eight years, albeit increasingly a shared-custody arrangement as the father became gradually more involved in the life of his daughter and sought additional custodial responsibilities. The child's mother, prior to her death, had sought assistance from her mother and had encouraged the relationship between grandmother and grandchild. The father, while not involved in the child's life for over a year, consented to the guardianship arrangement and entered into agreed orders resolving custody issues in favor of joint custody arrangements with the grandmother. From the child's birth and over the course of the next eight years, the grandmother has served as a parent to K.H. in every conceivable capacity. Such relationship

15

is not properly characterized as temporary. This was a significant relationship that unquestionably qualifies as a psychological parenting situation under this Court's definition in *Clifford K.*, as well as the subsequent cases chronicled above. We consequently find that the family court erred in finding that the grandmother's relationship with K.H. was temporary and that it was begun without the consent of her parents. We find that the grandmother is a psychological parent to K.H.

### C. Right of Psychological Parent to Continued Association

The psychological parent doctrine is an equitable theory and judge-made construct which permits courts, under appropriate circumstances, to recognize an individual who has maintained a parent-like relationship with a child and consequently has a right to continued visitation with that child. *See* Nicole M. Onorato, Note, *The Right to Be Heard: Incorporating the Needs and Interests of Children of Nonmarital Families into the Visitation Rights Dialogue*, 4 Whittier J. Child & Fam. Advoc. 491, 519-20 (2005) (explaining the psychological-parent doctrine).[8] In such instances, a court will evaluate the issue of whether

---

[8]Prior to recent attempts to articulate a legal standard for this theory, proponents of the concept analyzed it from a psychological perspective and explained that "[i]t is this psychological parenthood, rather than the biological events which may precipitate such a relationship, which many psychologists identify as the sine qua non of successful personality development." Note, *Alternatives to "Parental Right" in Child Custody Disputes Involving Third Parties*, 73 Yale L.J. 151, 158 (1963). Child psychoanalyst and Yale professor, Anna Freud, opined that the term "psychological parent" denotes "one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent." Joseph Goldstein, Anna Freud, and Albert J.

an adult has formed a bonded relationship with a child and whether the continuation of such

relationship is in the best interests of the child.[9]

These principles are consistent with this Court's approach to the right of a child

to continued association, as expressed quite concisely in *Honaker*. In that case, this Court

determined that the natural father had a right to custody of his child, but also considered

whether it was in the child's best interests to maintain a continued relationship with her

stepfather and half-brother. 182 W.Va. at 452, 388 S.E.2d at 325. This Court stated:

> [u]ndoubtedly, . . . [the child's] best interests must be the
> primary standard by which we determine her rights to continued
> contact with other significant figures in her life. Clearly, "these
> interests are interests of the child and not of the parent.
> Visitation is, to be sure, a benefit to the adult who is granted

---

Solnit, Beyond the Best Interests of the Child, 17, 98 (1973); *see also* Joseph Goldstein, Anna Freud, and Albert J. Solnit, Before the Best Interest of the Child, 39, 46-48 (1979) (advocating the use of the psychological parent doctrine where child was separated from biological or adoptive parents for a long period of time and proposing "maximum intervals beyond which it would be unreasonable to presume that a child's . . . ties with his absent [natural] parents are more significant than those that have developed between him and his longtime caretakers").

[9]In some states utilizing the psychological parent concept, a court finding the existence of such a relationship will generally "treat the third party as equal to the natural parent and will apply the 'best interests of the child' standard to decide visitation, much the same as if two biological parents were vying for visitation or custody in a divorce proceeding." Lindsy J. Rohlf, Note, *The Psychological-Parent and DeFacto-Parent Doctrines: How Should the Uniform Parentage Act Define "Parent"?*, 94 Iowa L. Rev. 691, 700 (2009); *see also V.C. v. M.J.B.*, 748 A.2d 539, 554 (N.J. 2000) ("Once a third party has been determined to be a psychological parent to a child, . . . he or she stands in parity with the legal parent. Custody and visitation issues between them are to be determined on a best interests standard . . . ." (citation omitted)).

visitation rights with a child.  But it is not the adult's benefit about which the courts are concerned.  It is the benefit of the child that is vital."  "Visitation is not solely for the benefit of the adult visitor but is aimed at fulfilling what many conceive to be a vital, or at least a wholesome contribution to the child's emotional well being by permitting partial continuation of an earlier established close relationship." *Looper v. McManus*, 581 P.2d 487, 488 (Okla. Ct. App.1978).

*Honaker*, 182 W.Va. at 452, 388 S.E.2d at 325 (footnotes omitted).  In *Honaker,* this Court also explained:

The best interests of the child concept with regard to visitation emerges from the reality that "[t]he modern child is considered a person, not a sub-person over whom the parent has an absolute and irrevocable possessory right.  The child has rights. . . ."  Another concern is "the need for stability in the child's life. . . .  [T]ermination of visitation with individuals to whom the child was close would contribute to instability rather than provide stability.["]

*Id.*, 388 S.E.2d at 326 (footnotes omitted).  "[C]ontinuity and stability in a child's life most certainly count for something . . . .  Children are not dogwood trees, to be uprooted, replanted, then replanted again for expediency's sake." *Guardianship of Kassandra H.*, 64 Cal.App.4th 1228, 1238 (Cal. App. 1998).

As apparent from the extensive line of cases decided by this Court, the rights of K.H. to continued association with her grandmother must be a vital part of this equation. The father emphasizes the United States Supreme Court's decision in *Troxel v. Granville,* 530 U.S. 57 (2000), and the fundamental right of a parent to make decisions concerning the

care, custody, and control of his or her children.  In *Troxel*, the United States Supreme Court held that awarding visitation to a non-parent, over the objections of a parent, is subject to constitutional limitations.  The Court in *Troxel* invalidated a Washington statute authorizing "any person" to petition for visitation rights "at any time[,]" and described the statute as "breathtakingly broad."  *Id*. at 67.[10]   This Court has examined the *Troxel* case, noting that it "instructs that a judicial determination regarding whether grandparent visitation rights are

_____

[10]A legal commentator analyzed the effect of *Troxel* on children's constitutional rights and concluded as follows:

> Before *Troxel*, it was abundantly clear that under the U.S. Constitution children possessed rights to equal protection, to due process, and to privacy in a wide variety of settings.  After *Troxel*, it appears that at least six of the justices would weigh children's interest in protection of intimate relationships in the balance of constitutional rights.
>
> As the least powerful of groups and most vulnerable of persons, children are arguably most in need of rights.  In a conceptual scheme in which adults have rights and children have mere interests, children's interests too often are trumped by the more powerful notion of rights.  Judges and legislatures are increasingly unwilling to view the rights of parents as paramount . . . .  The Supreme Court has recognized children's rights in many different settings, from juvenile justice to education.  After *Troxel,* it seems clear that in a properly presented custody case, the Court can be expected to recognize children's rights to due process, equal protection, and privacy in the context of custody as well.  The challenge for scholars (and for judges) is to acknowledge children's rights in custody cases in a manner that does not treat them like small adults, that takes account of their essential difference, and that respects their complex needs for nurture, protection, identity, and connection.

Barbara Bennett Woodhouse, *Talking About Children's Rights in Judicial Custody and Visitation Decision Making*, 36 Fam. L.Q. 105, 113-14 (2002) (footnotes omitted).

appropriate may not be premised *solely* on the best interests of the child analysis." *Cathy L.M. v. Mark Brent R.*, 217 W.Va. 319, 327-28, 617 S.E.2d 866, 874-75 (2005) (emphasis supplied). Instead, this Court emphasized in *Cathy L.M.* that the evaluating court "must also consider and give significant weight to the parents' preference, thus precluding a court from intervening in a fit parent's decision making on a best interests basis." *Id.* That is the gravamen of the *Troxel* decision; the true failing of the Washington statute in *Troxel* was "not that the [trial court] intervened, but that when it did so, it gave no special weight at all to [the parent's] determination of her daughters' best interests." 50 U.S. at 69.

As this Court explained in footnote seven of *In re Visitation of A.P.*, 231 W. Va. 38, 743 S.E.2d 346 (2013):

> Although *Troxel* does not define "special weight," state courts attempting to interpret and apply *Troxel* have reasoned that "special weight" indicates considerable deference. In *In re M.W.*, 292 P.3d 1158 (Colo. App. 2012), for instance, the Colorado Court of Appeals explained that "[g]iving special weight means that the presumption favoring the parent's decision can be rebutted only by clear and convincing evidence that granting parental responsibilities to the nonparent is in the child's best interests." *Id*. at 1161.

231 W.Va. at 42 n.7, 743 S.E.2d at 350 n.7. In *State ex rel. Brandon L. v. Moats*, 209 W.Va. 752, 551 S.E.2d 674 (2001), this Court held that the West Virginia grandparent visitation statute was constitutional because it is much narrower than the Washington statute evaluated in *Troxel*. *Id*. at 760, 551 S.E.2d at 682. This Court, in *Brandon L,* did not identify "the

amount of weight that should attach to the factor of parental preference . . . ." *Id.* at 763, 551

S.E.2d at 685.  We noted, however, that "in light of the *Troxel* decision it is clear that 'the

court must accord at least some special weight to the parent's own determination' provided

that the parent has not been shown to be unfit." *Id.* (quoting *Troxel*, 530 U.S. at 70).[11]

An enlightening discussion regarding *Troxel* was included a dissenting opinion

in *In re Marriage of Winczewski*, 72 P.3d 1012 (Or. Ct. App. 2003) (Brewer, J., dissenting),

as follows:

> When the competing rights of child and parent are pitted
> against each other, a balancing of interests is appropriate.  That
> notion finds support in the *Troxel* test.  As discussed, *Troxel*
> teaches that a court cannot award parenting time to a nonparent
> over the objection of a fit parent based solely on best interest
> considerations.  *Troxel,* 530 U.S. at 69, 120 S.Ct. 2054
> (O'Connor, J., plurality opinion).  However, the presumption

[11]Even states adhering to a strict scrutiny methodology in evaluating nonparent child access statutes recognize the *child's* interest in the preservation a relationship with a nonparent.  In *Rideout v. Riendeau*, 761 A.2d 291 (Me. 2000), for instance, the Maine Supreme Court, based upon the theory that a compelling state interest is required to justify intervention in the context of Maine's nonparent parenting time statute, observed that the interest in continued access "springs not from any common law right of the grandparent to visitation with the child, but from the *child's* significant need to be assured that he or she will not unnecessarily lose contact with a grandparent who has been a parent to that child."  *Id.* at 301-02; *see also Troxel*, 530 U.S. at 86 (Stevens, J., dissenting) ("There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies-the child.").  It is therefore imperative to acknowledge that "the understanding of visitation as a parental right, which marginalizes the nurture and care of children and disregards their relational interests, is incompatible with a relational understating of visitation."  Ayelet Blecher-Prigat, *Rethinking Visitation: From A Parental to A Relational Right*, 16 Duke J. Gender L. & Pol'y 1, 2 (2009).

21

that must be applied before best interests are considered focuses solely on the parent's ability to act in the child's best interests. In other words, the presumption relates to the very factual determination that must be made if it is rebutted. Because, in a real sense, the *Troxel* presumption blends with the best interests test, there is a certain circularity to the Court's analysis. That circularity leaves one to wonder whether there is less to the presumption than initially meets the eye. As one commentator has observed:

> The significance of *Troxel* lies in its subtlety, not in any rigid analysis of recognized and established constitutional law doctrine. The opinion marks an evolution in parental autonomy protection by what it pronounces as well as by what it avoids. By balancing the State's interest in protecting the child with the parent's interest in making child-rearing decisions free from unnecessary State interference, the Court no longer accords blind, unquestioning deference to the decisions of presumptively fit parents. Ideally, when courts decide to balance the competing interests equally, the child's needs will be served and will prevail.

Sandra Martinez, The Misinterpretation of *Troxel v. Granville*: Construing the New Standard for Third Party Visitation, 36 Fam. L.Q. 487, 499 (2002). In sum, *Troxel* neither requires nor presages a strict scrutiny analysis of rights in nonparent custody and parenting time cases; instead, the deference to parental prerogative that it requires entails a balancing of distinct family interests.

72 P.3d at 1057-58 (Brewer, dissenting).

A fundamental principle, properly gleaned from the scholarly writings and legal opinions reviewed by this Court, is that the pronouncements of *Troxel* do not predispose

22

every case to an ultimate determination favoring the natural parent in a complete and conclusive manner.[12] An assessment of the specific circumstances of each case is still required, and while the reviewing court must accord special weight to the preferences of the parent, the best interests of the child are not to be ignored and must be included as a critical component of the dialogue regarding visitation or custody.

As the New Jersey Supreme Court in *Moriarty v. Bradt*, 827 A.2d 203 (N. J. 2003), concisely stated, "[t]he possibilities are as varied as the factual scenarios presented." 827 A.2d at 224. These possibilities should be deliberated in a manner conducive to the protection of the child. The Supreme Court of Pennsylvania summarized the process aptly in *Hiller v. Fausey*, 904 A.2d 875 (Pa. 2006): "[W]e refuse to close our minds to the possibility that in some instances a court may overturn even the decision of a fit parent to

---

[12]It has been noted that "[b]ecause the various opinions in *Troxel* prevented the Court from speaking with a clear and unified voice, its decision is subject to misinterpretation." *Winczewski*, 72 P.3d 1012, 1056 (Brewer, dissenting). As insightfully explained by the New Jersey Supreme Court in *Moriarty v. Bradt*, 827 A.2d 203 (N. J. 2003):

> The [*Troxel*] Court avoided the basic issue of the appropriate level of scrutiny and the standard to be applied. It also stopped short of invalidating nonparental visitation statutes per se and declined to define "the precise scope of the parental due process right in the visitation context" because "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied" as "much state-court adjudication in this context occurs on a case-by-case basis."

827 A.2d at 216-17 (quoting *Troxel*, 530 U.S. at 73-74).

exclude a grandparent from a grandchild's life, especially where the grandparent's child is deceased and the grandparent relationship is longstanding and significant to the grandchild." *Id.* at 886-87.[13]

The father in the present case contends that the family court allowed for a gradual transition and that nothing further is necessary. In reality, the family court order only provided for a limited period of gradual transition, the terms of which have now expired.[14]

_____

[13]In a concurrence in *Hiller*, the writer addressed the issue of according proper deference to the requirements of *Troxel* and noted as follows:

> [T]he due process right that the Supreme Court affirmed in *Troxel* is important but limited: a court may not override a parent's decision about the care or custody of a child simply because the court determines that the decision is not in the child's best interest, as the trial court did in *Troxel* regarding a grandparent's interest in visitation. Instead, the court must presume that a fit parent's decision is in the best interest of the child, and the court may reach a decision contrary to the wishes of the parent only if there is evidence sufficient to overcome that presumption. *Troxel* goes no further.

904 A.2d at 902 (Newman, J., concurring).

[14]The family court order stated as follows:

> Th[e] following schedule or gradual transitional period shall be followed:
> a. Commencing November 21, 2013 through January 31, 2014 the minor child shall be with Grandmother every other weekend (Friday after school or at 3pm until Sunday evenings at 5). The minor child shall also be with Grandmother every Wednesday after school or 3pm through Thursday morning at 8am or drop

(continued...)

24

No further visitation is delineated in the family court order. While the grandmother has apparently continued to exercise visitation during the pendency of this appeal, the family court order did not actually require any ongoing visitation.

Based upon a thorough evaluation of the appendix record, this Court finds that K.H. and her psychological parent/grandmother are entitled to continued visitation. This Court is confident that such visitation can be structured in a manner which will not substantially interfere with the parent-child relationship or adversely affect the father's fundamental rights to custody of K.H.

## IV. Conclusion

For the foregoing reasons, this Court finds that the family court did not abuse its discretion by terminating the grandmother's guardianship of K.H., and the decision terminating the guardianship is consequently affirmed. However, due to the grandmother's status as psychological parent to the child, the grandmother and the child are entitled to continued association with one another. Thus, we remand this matter for the entry of an order, consistent with this opinion, specifying a liberal visitation schedule to permit

---

[14](...continued)
off at school or any other night that the parties may agree.
b. Commencing February 1, 2014 through the last day of the minor child's school the minor child shall be with Grandmother every other weekend (Friday after school or at 3pm until Sunday evenings at 5).

significant and meaningful opportunity for the grandmother to interact with K.H.  In

formulating such arrangement, the family court must also be cognizant of the grandmother's

recent filing of a petition for grandparent visitation rights under West Virginia Code §§ 48-

10-101 to-1201 (2014), and the two separate and distinct methods of seeking relief initiated

by the grandmother should be merged for consideration by the family court.[15]


The court must also be cognizant of the need to formulate a visitation schedule

"as expeditiously as possible[,]" as this Court explained in *Honaker*.  182 W.Va. at 453, 388

S.E.2d 326.  Transitions in the life of a child should be fashioned in a manner which

minimizes the trauma to the child.  The plan "should give due consideration to both parties'

work and home schedules and to the parameters of the child's daily school and home life, and

should be developed in a manner intended to foster the emotional adjustment" of the child

"while not unduly disrupting the lives of the parties or the child[]."  *Id.*  As this Court in

*Honaker* advised:

> No matter how artfully or deliberately the trial court judge draws
> the plan for these coming months, however, its success and
> indeed the chances for [the child's] future happiness and
> emotional security will rely heavily on the efforts of these two
> [caretakers].  The work that lies ahead for both of them is not
> without inconvenience and sacrifice on both sides.  Their
> energies should not be directed even partially at any continued
> rancor at one another, but must be fully directed at developing

---

[15]As of the date of oral argument in this case, the family court had not yet issued a
written order on the grandmother's petition for grandparent visitation rights.

26

compassion and understanding for one another, as well as showing love and sensitivity to the [child's] feelings at a difficult time in all their lives.

*Id.* at 453, 388 S.E.2d at 326-27.[16]

Affirmed in part; reversed in part; and remanded.

---

[16]As in other child custody matters, the visitation schedule will be subject to modification as circumstances warrant.