**FILED**

**May 29, 2020**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*No.* 18-1043 *State of West Virginia v. Kevin Woodrum*

**ARMSTEAD, Chief Justice, dissenting, joined by JENKINS, Justice:**

Despite a long legal history in which the definition of kidnapping in our State has included *either* transportation *or* restraint with the intent to carry out certain harmful acts, the majority has misinterpreted the Legislature's recent amendments to our State's kidnapping statute to seriously limit its applicability. Because I firmly believe the Legislature intended kidnapping to include the unlawful restraint of a person with the intent to terrorize that person or another – as took place here – I dissent from the majority's opinion.

The horrendous facts of this case clearly fit within the long-standing definition of kidnapping as embodied in the clear meaning of the statute.

Petitioner and J.W.[1] were married. On the night of December 9-10, 2016, Petitioner unleashed a fury against his wife that can only be described as ultra-violence. That evening, J.W. travelled from her home in Boone County to Charleston, where she and a friend went to Uncork and Create, a Charleston art studio, for a relaxing evening of drinks and drawing. When J.W. and her friend returned to Boone County, Petitioner met J.W.

---

[1] Consistent with our long-standing practice in cases with sensitive facts, this separate opinion uses initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

and her friend at the Magic Mart in Danville, where he drove both J.W. and her friend to her friend's house, dropped off her friend, and then transported J.W. to the marital home.

During the drive home, Petitioner angrily interrogated J.W. about her evening. Accusing J.W. of an affair, Petitioner asked J.W. if she wanted a divorce. By the time they arrived home, J.W. was terrified of Petitioner. Unsatisfied with J.W.'s responses to his inquisition, Petitioner ordered her into the house and followed her inside. Once there, he grabbed J.W. by the neck and threw her on the floor, locking the outside door behind him, making it impossible for J.W. to leave. Petitioner took J.W.'s phone and searched it, while continuing his blistering interrogation. After searching the phone for some period, Petitioner apparently found what he was looking for – photographs of J.W. at a bar. In a violent rage, Petitioner ordered J.W. to march upstairs while ripping off J.W.'s clothes. Once Petitioner transported J.W. upstairs to their bedroom, he threw J.W. on the floor, and resumed his questioning while continuing to search J.W.'s phone.

At some point, Petitioner discovered photographs and messages between J.W. and another man. This caused the already tenuous situation to quickly degenerate. Petitioner used scissors and chopped off chunks of J.W.'s hair, despite her adamant protestations and attempts to cover her head. He then ordered J.W. to lie down on the bed, where he duct-taped rope around her arms and legs, and fastened the rope to the bedframe. For the next several hours, Petitioner straddled J.W. and choked her with both hands around

2

her neck, causing J.W. to slip in and out of consciousness. "Wake up bitch," Petitioner would scream at her during her periods of semi-consciousness.

The torture continued, with Petitioner alternately slapping, punching, and hitting her in the face and head with his hands and the phone. After a period of intense questioning, which elicited unsatisfactory answers from J.W., Petitioner began methodical punching of J.W.'s vagina. If that was not enough, Petitioner pulled out chunks of J.W.'s hair and attempted to break her jaw, by shoving both hands into her mouth and prying her mouth open as wide as possible.

Not only did he viciously attack J.W.'s vagina, he also repeatedly attempted to burst J.W.'s breast implants by punching and squeezing her breasts and twisting her nipples. Petitioner then used an open flame to burn J.W.'s body – from her head all the way down to her feet. He even waterboarded her, pouring water in her face, while continuing his questioning.

Mercifully, Petitioner took a brief hiatus from the physical abuse and began breaking pieces of J.W.'s jewelry and ripping apart various items of J.W.'s clothing. He called her a whore, told her what a bad mother she was, and chillingly warned her – "You know I'm going to kill you tonight; right?"

This abuse lasted until the next morning. Attempting to end her ordeal, J.W. told Petitioner that her "Mawmaw" was expecting J.W. to pick up the kids, hoping that Petitioner would allow J.W. to use the phone. Instead, Petitioner stuck a sock in J.W.'s mouth, placed duct tape over the sock, and called J.W.'s "Mawmaw" to ask her to keep the kids longer. Turning to J.W., he said, "We've got all day," then choked her again.

As the morning went on, J.W.'s family attempted to contact her. First, those attempts were by text message. Then, as those messages went unanswered, her family tried to reach her by telephone. For a time, Petitioner answered the text messages by stating that J.W. was sleeping. When the calls began, Petitioner answered the phone, but only after once again duct-taping a sock in J.W.'s mouth. During one phone call, J.W.'s aunt told Petitioner that if he did not let her speak to J.W., she was calling the police.

All the while, Petitioner continued to berate J.W. with his incessant interrogation. By that point of her ordeal, J.W. could no longer hear Petitioner speak. To possibly help her situation, J.W. suggested to Petitioner that she may be in a better position to continue to answer Petitioner's questions if she were to have some coffee and Tylenol. Petitioner untied her and brought her coffee. After a single sip, Petitioner crushed the mug of hot coffee into her face and forced her back on to the bed. This time, however, Petitioner was far more deviant. He placed his full weight on one of J.W.'s legs, forced the other leg open, and methodically "over and over" pounded J.W.'s vagina with his fist. He penetrated J.W.'s vagina, continuing to "just punch and punch," as J.W. begged him to stop.

4

Petitioner continued to interrogate J.W. and any unwelcomed answers resulted in punches to both her face and vagina. Petitioner grabbed J.W.'s right arm and wrist, causing something to tear, and J.W. to scream and cry out in pain. Petitioner ordered her to get dressed, and when J.W. bent down to pick up some clothing, Petitioner kicked her ribs, knocking her to the ground. She finally managed to get dressed, and Petitioner transported her downstairs. Petitioner told her that the police had been called, and that the violence he inflicted upon her was her fault.

Finally, approximately twelve hours after her nightmare began, two members of the West Virginia State Police arrived at the home. After arguing with these troopers for several minutes, Petitioner allowed them into the house. What they saw was, in a word, "breathtaking." One trooper described J.W.'s appearance as one of the few "breathtaking events" he had experienced in his thirteen-year State Police career. Thankfully, J.W.'s nightmare ended when the troopers arrested Petitioner and charged him with multiple crimes, including the kidnapping charge that is at issue in this appeal.

What happened to J.W. that night was a nightmare that clearly meets the statutory definition of kidnapping:

> (a) Any person who unlawfully restrains another person with the intent:
>
> (1) To hold another person for ransom, reward, or concession;

5

(2) To transport another person with the intent to inflict bodily injury or to terrorize the victim or another person; or

(3) To use another person as a shield or hostage, shall be guilty of a felony and, upon conviction, shall be punished by confinement by the division of corrections for life, and, notwithstanding the provisions of article twelve, chapter sixty-two of this code, shall not be eligible for parole.

W. Va. Code § 61-2-14a (2014).[2]

I believe that a clear reading of the statute calls for a very different conclusion than that reached by the majority. A plain reading of the statute demonstrates that, under subsection (a)(2), a person may be found guilty of kidnapping in two possible ways:

(1) Unlawfully restraining another person with the intent to transport another person with the intent to inflict bodily injury; or,

(2) Unlawfully restraining another person with the intent to terrorize the victim or another person.

Here, the jury instruction tracked the second crime delineated in subsection (a)(2) – that to find Petitioner guilty of kidnapping it must find beyond a reasonable doubt that:

1. The Defendant, Kevin Woodrum;

2. In Boone County, West Virginia;

---

[2] In footnote one, the majority opinion notes that this statute was amended by the Legislature in 2017. The 2014 version is at issue in this matter.

6

3. On or about the 9th day of December to the 10th day of

   December, 2016;

4. Did unlawfully;

5. Restrain [J.W.];

6. With the intent to terrorize [J.W.].


This jury instruction is not only consistent with the language of the 2012 statute, it is also consistent with the long-recognized, common-sense definition of kidnapping. It is instructive to look at the traditional meaning of kidnapping as it is reflected in nearly a century of statutory guidance. The previous version of our kidnapping statute provided:

> Any person who, by force, threat, duress, fraud or enticement take, confine, conceal, or decoy, inveigle or entice away, or transport into or out of this state or within this state, or otherwise kidnap any other person, or hold hostage any other person for the purpose or with the intent of taking, receiving, demanding or extorting from such person, or from any other person or persons, any ransom, money or other thing, or any concession or advantage of any sort, or for the purpose or with the intent of shielding or protecting himself, herself or others from bodily harm or of evading capture or arrest after he or she or they have committed a crime shall be guilty of a felony and, upon conviction, shall be punished by confinement by the division of corrections for life. . . .

W. Va. Code § 61-2-14a (1999). Under a plain reading of the 1999 version of our statute, which was first enacted in 1933 in reaction to the kidnapping of Charles Lindbergh's baby, transport was not necessarily a requirement to find a person guilty of the crime of kidnapping:

7

> From the formation of this State until 1933, we did not have a general kidnapping statute. We utilized two Virginia statutes which dealt with the abduction of a female and the kidnapping of a child. It was not until the kidnapping of Charles Lindbergh's child in 1932 that many states, including West Virginia, enacted broader kidnapping statutes with more severe penalties patterned in some degree after the federal kidnapping act, 18 U.S.C. § 1201. **Generally, these statutes expanded the scope of kidnapping to include almost any forced movement or detention within the State**.
> m

*State v. Miller*, 175 W. Va. 616, 620, 336 S.E.2d 910, 914 (1985) (emphasis added).

Clearly, under our prior version of this statute it was not necessary to prove forced movement – *i.e.*, transport – merely that a person's liberty had been restrained and a concession or advantage was obtained.

When the Legislature amended our kidnapping statute in 2012, it rewrote this section. *See* W. Va. Code § 61-2-14a (2012). This rewrite modernized our law, apparently using the Model Penal Code as a guide. "A majority of states derive at least one of their kidnapping statutes from the Model Penal Code section 212.1." Melanie A. Prince, *Two Crimes for the Price of One: The Problem with Kidnapping Statutes in Tennessee and Beyond*, 76 Tenn. L. Rev. 789, 806 (2009). When we compare the 2012 version of our statute with the provisions of the Model Penal Code, the plain and unambiguous language of our statute supports the jury instruction given in this matter. Section 212.1 of the Model Penal Code provides:

> A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully

confines another for a substantial period in a place of isolation, with any of the following purposes:

(a) to hold for ransom or reward, or as a shield or hostage; or

(b) to facilitate commission of any felony or flight thereafter; or

(c) to inflict bodily injury on or to terrorize the victim or another; or

(d) to interfere with the performance of any governmental or political function.

MODEL PENAL CODE § 212.1 (AM. LAW INST. 2018). The notes from the Model Penal Code clarify this even further.

> Section 212.1 confines the most serious offenses to instances of substantial removal or confinement for a series of specified purposes, such as to hold for ransom or reward or to interfere with the performance of a governmental function. The **removal or confinement** must be accomplished by force, threat, or deception, or in the case of underage children or incompetents, without the consent of a parent or other appropriate person.

MODEL PENAL CODE § 212, Pt. II, Refs & Annos (AM. LAW INST. 2018) (emphasis added). Thus, under its plain meaning, the Model Penal Code defines kidnapping as either transporting *or* confining another person for the purpose of terrorizing the victim. Indeed, the Legislature adopted subsection (c), "to inflict bodily injury or to terrorize the victim or another," verbatim from the Model Penal Code and merely added the language "to transport another person" to the beginning of that phrase. Looking at West Virginia Code § 61-2-14a(a)(2)(2012), that fact is clear:

> (2) To transport another person with the intent to inflict bodily injury or to terrorize the victim or another person.

9

By adopting Petitioner's interpretation of the statute, the majority renders the word "to" in the phrase "to terrorize" entirely meaningless. Had the Legislature intended for "[t]o transport" to apply to both subsequent phrases within the subsection, it would have simply provided "with the intent to inflict bodily injury or terrorize the victim or another person," leaving out the word "to." The addition of the word "to" immediately prior to "terrorize" clearly establishes the phrase "to terrorize the victim or another person," as an independent phrase, not subject to the modifier "[t]o transport."

The Legislature simply modernized our code by adopting the Model Penal Code, with some revisions, while at the same time requiring the element of transport for one specific type of kidnapping – when there is intent to inflict bodily injury. The Legislature adopted this provision directly from the Model Penal Code, and we should read the amendment as applying only to that portion of the provision which it directly modifies, that being "with intent to transport another person with the intent to inflict bodily injury." The provisions of unlawfully restraining another person with intent to terrorize the victim are another crime, separate and distinct from that which requires transport. This reading is consistent with the traditional definition of kidnapping, the Model Penal Code, and the plain language of the statute.

Therefore, the circuit court correctly instructed the jury on the elements of kidnapping, and I believe that this Court should affirm the circuit court's findings on that issue.

In a footnote, the majority opinion allowed Petitioner's convictions to stand for malicious assault and domestic battery – second offense – and I agree with that disposition. However, I respectfully dissent as to the reversal of the circuit court's denial of Petitioner's motion for a new trial on count one, kidnapping and count four, assault during the commission of a felony.

I am authorized to state that Justice Jenkins joins in this dissent.