IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2020 Term

_____

No. 19-0598

_____

**FILED**
**June 17, 2020**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

IN RE A.T.-1, A.T.-2, AND N.T.

_____

Appeal from the Circuit Court of Kanawha County
The Honorable Charles King
Case Nos. 16-JA-414, 16-JA-415, and 16-JA-416

REVERSED AND REMANDED

_____

Submitted: May 20, 2020
Filed: June 17, 2020

Joseph H. Spano, Jr., Esq.
Pritt & Spano, PLLC
Charleston, West Virginia
Counsel for Petitioner B.T.


Matthew A. Victor, Esq.
VICTOR & VICTOR, LLP
Charleston, West Virginia
Guardian ad Litem

Patrick Morrisey, Esq.
Attorney General
S. L. Evans, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent DHHR

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE WORKMAN not participating.

SYLLABUS BY THE COURT

1.    "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected.  These findings shall not be set aside by a reviewing court unless clearly erroneous.  A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.  However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."  Syllabus Point 1, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

WALKER, Justice:

Following a 2016 report that their home was unfit for habitation, the West Virginia Department of Health and Human Resources (DHHR) removed the minor children, A.T.-1, A.T.-2, and N.T., and filed an abuse and neglect petition against the parents.[1] Petitioner B.T. is the father of the children,[2] who was granted a pre-adjudicatory improvement period starting on September 14, 2016. Over the next two years, the circuit court granted extensions to that pre-adjudicatory improvement period and B.T. was not adjudicated until November 23, 2018. After more delays, the circuit court terminated B.T.'s parental rights on June 3, 2019. On appeal, B.T. argues that the circuit court erred in terminating his rights even though he substantially complied with the terms and conditions of his pre-adjudicatory improvement period and corrected the allegations contained in the abuse and neglect petition against him.

We find that the circuit court erroneously granted multiple extensions to the pre-adjudicatory improvement period in violation of the statutory time limits set by West Virginia Code §§ 49-4-610(1) and 49-4-610(9). And, we find that the circuit court's factual determinations were clearly erroneous and contrary to the record in this case. So, we

---

[1] Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015). And, because two of the children share the same initials, we refer to them throughout this opinion as A.T.-1 and A.T.-2, respectively.

[2] Eventually the mother of the minor children abandoned the proceedings and her parental rights were terminated. Her rights are not the subject of this appeal.

reverse the circuit court's order terminating B.T.'s parental rights and remand this matter for a new dispositional hearing consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 25, 2016, the DHHR received a report that the home of B.T. and his minor children, A.T.-1, A.T.-2, and N.T. was unfit for human habitation. The DHHR investigated, substantiated the alleged conditions, and removed the children from the home. On August 2, 2016, the DHHR filed a report stating that the home was "extremely filthy," that there was little food in the home, and that one of the children, A.T.-2, was suffering from pain in her legs.[3] The DHHR's report further stated that B.T. had a full-time job, that B.T. and the children's mother had engaged in domestic violence that placed the children in danger,[4] and that the children were developmentally delayed as a result of B.T.'s lack of knowledge about average childhood progression and development.[5] Ultimately, the DHHR concluded that B.T. medically neglected A.T.-2, and failed to provide a safe and clean home for all three children.

The parties appeared for a preliminary hearing on August 11, 2016. Both parents waived their rights to a preliminary hearing and moved for parenting classes,

---

[3] A later medical examination revealed A.T.-2 suffered from an untreated broken leg.

[4] At the time of the DHHR's investigation and the filing of the abuse and neglect petition, B.T. and the children's mother were unmarried cohabitants.

[5] This determination stemmed from the DHHR's observation that the older children, who were ages 2 and 4 at the time of removal, were unable to communicate verbally and that they were still in diapers.

supervised visitation, parental fitness evaluations, psychological evaluations, and adult life skills services. The circuit court granted their motions. On September 14, 2016, B.T. moved for a pre-adjudicatory improvement period. The court granted this motion on October 3, 2016. In the ensuing months, the DHHR and the parents, at separate times, moved for eight separate extensions to this pre-adjudicatory improvement period.[6] At each of the review hearings through January 2018, the circuit court explicitly found that B.T. was "substantially complying" with the terms of the pre-adjudicatory improvement period.

Once the improvement period started, B.T. began regular supervised visits with the children. Several reports from the supervised visitation providers indicate that B.T. appropriately parented the children during the visits, that he and the children had a normal, nurturing bond, and that B.T. was engaged with the children during the visits. Further reports indicated that B.T. was "internalizing and recognizing" that the unsuitable condition of the home was neglectful and led to the filing of the petition. And, in May 2017, the foster parents requested an increase in the frequency of B.T.'s supervised visits, which Child Protective Services (CPS) approved. Psychological and parental fitness evaluations also indicated that B.T. was capable of parenting the children, though he may need occasional assistance. Specifically, the parental fitness report prepared by Home Base, Inc., indicated that B.T. needed further education with regard to consistency in

---

[6] The motions to extend were made at each review hearing on the following dates: November 21, 2016; January 12, 2017; March 20, 2017; May 17, 2017; June 6, 2017; July 20, 2017; October 31, 2017; and January 11, 2018. Our review of the record indicates that the DHHR moved for all but two of those extensions as the parents moved to extend in July and October 2017.

parenting, developmental expectations, and disciplinary processes. The psychological report prepared in October 2017 by Scott Spaulding indicated that B.T. displayed no mental incapacity that would impact his ability to parent, but also stated that B.T. would benefit from treatment for generalized anxiety, depression, and concentration problems.

At the March 15, 2018, review hearing, the DHHR moved to set this matter for disposition, stating that the parents had not substantially complied with their improvement period and that there had been "no substantial change in regard to the parents' stability [sic] to adequately care for the children." The circuit court set disposition for May 21, 2018. On May 18, 2018, B.T. moved to dismiss the petition against him, arguing that he had substantially complied with all of the requirements of his pre-adjudicatory improvement period and rectified the conditions that led to the filing of the petition. Specifically, he contended that he had obtained suitable, clean housing for himself and all three children. He also raised for the first time that the pre-adjudicatory improvement period had extended well beyond the statutory time limit.

Although the May 21, 2018, hearing was scheduled as a dispositional hearing, both the parties and the circuit court treated it as another improvement period review hearing. This is apparent from the order that resulted from this hearing, in which the circuit court explicitly referred to a "review hearing." The DHHR again moved to set the matter for disposition, and the circuit court set disposition for July 2, 2018. The court did not address B.T.'s motion to dismiss. And, a multi-disciplinary team (MDT) report following this hearing indicates that a worker "popped in" during a scheduled supervised

4

visit and observed that B.T. struggled to communicate to A.T.-1 how to share a toy. The worker also indicated that "overall parental functioning [was] at a deficit" but did not expand upon that statement.

B.T. renewed his motion to dismiss between the conclusion of the May 21 hearing and the July 2, 2018 hearing, when the parties appeared for a dispositional hearing. Yet again, the circuit court's order following this hearing reflects that no dispositional hearing was held, only another review hearing. The DHHR moved once again to set the matter for disposition, which the court granted and scheduled the new dispositional hearing for October 2, 2018. The children's mother moved to continue the October 2 hearing as she entered into a rehabilitation program.[7] The court granted the continuance but also finally held an *adjudicatory hearing* on the same date, October 2.

In November 2018, the DHHR moved to amend the abuse and neglect petition to include as a basis for termination of the parents' parental rights that the children had been in foster care for fifteen of the most recent twenty-two months in violation of West Virginia Code § 49-4-610(9). The circuit court granted the motion to amend. On November 26, 2018, B.T. again renewed his motion to dismiss, this time arguing that he had not only found suitable housing, but also that he had maintained full-time employment and had left the children's mother and married a new spouse, who was capable and willing to assist in parenting the children.

---

[7] We take care to note that there were never any allegations that substance abuse by either parent served as the basis for the filing of the petition.

Also on November 26, 2018, the circuit court issued its order adjudicating both parents as abusing and neglectful. The order stated that the parents lacked the capacity to parent the children and denied B.T.'s motion to dismiss. And, the circuit court acknowledged that the pre-adjudicatory improvement period lasted for more than two years (twenty-six months at the time of the order). The order also set another dispositional hearing for February 19, 2019, but the order from this subsequent hearing indicates that the matter was continued to April 29, 2019, without providing any reason for that continuance. Disposition did not occur on April 29, though some evidence was taken at this hearing in the form of testimony from the DHHR and B.T. The circuit court again continued the disposition hearing to May 20, 2019, to take more evidence.

Prior to the May 20 hearing, the DHHR alleged that B.T. missed a single supervised visit with the children in February 2019 and that there were two visits at which B.T. failed to properly parent the children. At the first visit in June 2018, a CPS worker observed that B.T. struggled to articulate to A.T.-1 that he needed to share a toy. The report detailing this visit also stated that "overall parenting functioning was at a deficit." At the second highlighted visit in January 2019, A.T.-2 and N.T. evaded B.T., left the visitation room, and unplugged a computer system in the visitation center. The May 20 hearing went forward as scheduled, and in addition to evidence regarding these two visits, the circuit court heard testimony from B.T., B.T.'s mother, one of the foster parents, Jessica MacElravy (a Home Base, Inc. worker), and Brandi Russell (the CPS case manager). After presenting this testimony, the parties rested and the circuit court adjourned the hearing.

6

The circuit court issued its dispositional order on June 3, 2019, and made the following findings: (1) the mother abandoned the proceedings[8]; (2) both parents lacked the capacity to parent the minor children; (3) the parents were afforded a lengthy improvement period but made "no improvements in parenting"; (4) the parents were adjudicated abusing and neglectful because the children were in foster care for fifteen of the most recent twenty-two months in violation of West Virginia Code § 49-4-610(9); (5) the children were in foster care for thirty-four months at the time of disposition; (6) there was no likelihood the conditions of abuse and neglect could be corrected in the near future; and (7) the parents had not followed through with rehabilitative services designed to reduce or prevent abuse and neglect of the children. Upon making these findings, the circuit court terminated both parents' parental rights. B.T. appeals that order to this Court.

## II. STANDARD OF REVIEW

Our standard of review for appeals of orders from circuit court concerning abuse and neglect matters is well-established. We have previously held:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a

---

[8] It is unclear from the record when the children's mother stopped participating, but it is undisputed that she did, in fact, abandon the proceedings.

7

reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.[9]

With this standard in mind, we now address the parties' arguments.

### III.  DISCUSSION

B.T. raises several assignments of error on appeal.  First, he argues that the Circuit Court of Kanawha County erred in terminating his parental rights because he substantially complied with the terms and conditions of his pre-adjudicatory improvement period and corrected the allegations contained in the original petition.  Second, B.T. contends that the circuit court erred in denying post-termination visitation between himself and the children.[10]  Finally, he states that the circuit court erred in relying upon the guardian ad litem's recommendation in terminating his parental rights because the guardian ad litem never filed a written report or conducted an investigation.[11]

---

[9] Syl. Pt. 1, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

[10] Upon review of the circuit court's order, it is clear that the court did not deny post-termination visitation.  Rather, the court left visitation in the discretion of the children's foster parents.  Therefore, we need not address this assignment of error.

[11] The record confirms B.T.'s assertion that the guardian ad litem failed to file a written report, and the guardian ad litem conceded as much at oral argument.  While we do not explicitly address this assignment of error below, as we reverse and remand on other grounds, we admonish Mr. Victor for his failure to follow this Court's rules setting out the duties of this State's guardians ad litem.  Specifically, Rule 18a of the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings provides for the appointment of a guardian ad litem to represent the interest of the affected children, and directs guardians to Appendix A of those rules for guidance on the general duties of the guardian ad litem at each stage of the proceedings.  Appendix A, Section D, Subsections 7 and 8 provide that, at the adjudicatory and dispositional phases of the proceedings, the guardian ad litem must

8

The DHHR counters that the circuit court did not err in terminating B.T.'s parental rights because "the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered in making the final disposition in a child abuse and neglect proceeding" and because B.T. failed to show improvement in his parenting skills throughout his pre-adjudicatory improvement period. More specifically, the DHHR contends that "there is no evidence contained in this record to support such improvement, despite the length of time and resources utilized." The guardian ad litem filed a summary response, arguing that the circuit court's order terminating B.T.'s parental rights was amply supported by the record. We address the parties' arguments in turn.

## A.    The circuit court erred in permitting the pre-adjudicatory improvement period to extend beyond three months.

Before we address the parties' arguments relating to the merits of this case, we first consider the excessive length of the pre-adjudicatory improvement period. The circuit court granted B.T.'s motion for a pre-adjudicatory improvement period on September 14, 2016. But, the circuit court did not adjudicate him until some twenty-six months later when it issued its November 26, 2018 adjudicatory order.[12]

complete an investigation of the case and submit a written report, as well as provide a copy to all parties, at least five days prior to disposition.

[12] We also note that the circuit court held the adjudicatory hearing on October 2, 2018, but that the parties were under the impression that the October 2 hearing was to be for dispositional purposes. That hearing was mistakenly set to be a dispositional hearing (although the parents had not yet been adjudicated) in response to the DHHR's request for such hearing in July 2018. This is yet another procedural error committed below.

Pre-adjudicatory improvement periods are governed by West Virginia Code § 49-4-610(1), which states, in relevant part, "[a] court may grant a respondent an improvement period *not to exceed three months* prior to making a finding that a child is abused or neglected[.]"[13] West Virginia Code § 49-4-610(6) permits the extension of certain types of improvement periods, namely *post*-adjudicatory and post-dispositional improvement periods, but excludes *pre*-adjudicatory improvement periods from those that may be extended.[14] Even if pre-adjudicatory improvement periods could be extended, West Virginia Code § 49-4-610(9) explicitly sets time limits on keeping children in foster care during improvement periods:

> Notwithstanding any other provision of this section, no combination of any improvement periods or extensions thereto may cause a child to be in foster care more than fifteen months of the most recent twenty-two months, unless the court finds compelling circumstances by clear and convincing evidence that it is in the child's best interests to extend the time limits contained in this paragraph.

---

[13] Emphasis added.

[14] West Virginia Code § 49-4-610(6) states:

> A court may extend any improvement period granted pursuant to subdivision (2) [post-adjudicatory improvement periods] or (3) [post-dispositional improvement periods] of this section for a period not to exceed three months when the court finds that the respondent has substantially complied with the terms of the improvement period; that the continuation of the improvement period will not substantially impair the ability of the department to permanently place the child; and that the extension is otherwise consistent with the best interest of the child.

Finally, we have repeatedly stated that "[t]he time limitations and standards contained in [West Virginia Code § 49-4-601 *et seq*.] are mandatory and may not be casually disregarded or enlarged without detailed findings demonstrating exercise of clear-cut statutory authority."[15]

In this case, the pre-adjudicatory improvement period lasted twenty-six months. That exceeds the three-month time limit on pre-adjudicatory improvement periods imposed by § 49-4-610(1), as well as the fifteen-month time limitation on *all* combinations of improvement periods and their extensions imposed by § 49-4-610(9). And, the circuit court made no findings of fact that such extensions were in the best interest of the children in this matter. The orders do little more than acknowledge that B.T. and the children's mother were "substantially complying" with the terms of the improvement period before granting the extension. So, as B.T.'s pre-adjudicatory improvement period began on September 14, 2016, the statute mandates that it should have ended no later than December of 2016. As it did not end until November 26, 2018, we have no trouble concluding that each of the extensions to this improvement period was impermissible and the circuit court committed clear legal error in granting those extensions.

We find it necessary to address this procedural issue because, in November 2018, the circuit court permitted the DHHR to amend its abuse and neglect petition to include as a basis for termination of B.T.'s parental rights that the children in this matter

---

[15] *In re J.G.*, 240 W. Va. 194, 204, 809 S.E.2d 453, 463 (2018). *See also In re S.W.*, No. 19-1078 (W. Va. June 12, 2020).

had been in foster care for more than fifteen of the most-recent twenty-two months, in violation of West Virginia Code § 49-4-610(9). As noted above, at the time the petition was amended, the children had been in foster care for twenty-six months. And, in its June 3, 2019 dispositional order, the circuit court based its termination of B.T.'s parental rights, at least in part, upon the fact that these children were in foster care for this lengthy period.

> West Virginia Code § 49-4-605(a)(1) provides that
>
> the [DHHR] shall file or join in a petition or otherwise seek a ruling in any pending proceeding to terminate parental rights [. . .] if a child has been in foster care for 15 of the most recent 22 months as determined by the earlier of the date of the first judicial finding that the child is subjected to abuse or neglect or the date which is 60 days after the child is removed from the home[.]

This code section, in essence, requires the DHHR to alert the circuit court that the ongoing proceedings have extended beyond statutory limits and prompts the DHHR to seek a ruling from the court as to termination of parental rights.[16] On its face, § 49-4-605, like § 49-4-610(9), prohibits endless extension of improvement periods in violation of statutory time limits. Even though the DHHR's amended petition alerted the circuit court to the expiration of the time limit, it did not do so until more than a year after the fifteen-month time limit had expired. As the children were removed in July 2016, they were in foster care for fifteen months as of October 2017. The DHHR did not alert the circuit court to this fact until November 2018.

---

[16] W. Va. Code § 49-4-605(b) relieves the DHHR of this obligation in certain enumerated circumstances. None of those circumstances are present here.

12

We are also mindful that the DHHR was responsible for all but two of the requested extensions to the pre-adjudicatory improvement period, which caused these children to be in foster care for so long.[17] Finally, we reiterate that these extensions were erroneously granted on the part of the circuit court. In light of these considerations, we decline to allow B.T. to be punished for the delay caused by the DHHR and the circuit court's failure to adhere to the above statutory mandates, and instead turn to whether any of the substantive allegations in the petition justified termination of B.T.'s parental rights.

**B.      *The circuit court's remaining findings are unsupported by the record.***

We now turn to the analysis of whether the circuit court was justified in terminating B.T.'s parental rights on any of the court's other stated bases. This is the heart of B.T.'s first assignment of error that the circuit court erred in finding that he failed to substantially comply with the terms of his improvement period and that he failed to correct the conditions of abuse or neglect that led to the filing of the petition.

In the June 3, 2019, dispositional order, aside from addressing the time the children were in foster care, the circuit court made the following findings as to B.T.:

> 6.      That the Respondent Parents lack the capacity to parent;
>
> 7.      That the Respondent parents had extensive and lengthy improvement periods that lasted over two years with no improvements in parenting;
>
> [. . .]

---

[17] *See* note 6, *supra*. Additionally, the October 2017 extension was at the request of the mother, as she entered a substance abuse rehabilitation program. So, only a single extension was at the request of B.T., made jointly with the mother in July 2017.

10. That there is no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future, as Respondent Parents have not made sufficient efforts to rectify the circumstances that led to the filing of this Petition; [and]

11. That Respondent Parents have not followed through with rehabilitative services, the efforts of social, medical, mental health, or other rehabilitative agencies designed to reduce or prevent the abuse and neglect of the Respondent Children, as evidence by the continuation of conditions which threaten the health, welfare or life of the Respondent Children[.]

We find little factual support for any of the circuit court's findings with regard to B.T., and in fact, we find that the record before us clearly contradicts these findings.[18]

Beginning with the court's finding that B.T. lacked the capacity to parent, we first note that the circuit court repeatedly found in its various orders granting extensions to the improvement period that the parents were "substantially complying" with the terms of their improvement period. As such, it strains common sense to suggest that persons who were complying for over two years had made no improvement whatsoever in their parenting skills. Second, we acknowledge that the parental fitness evaluation performed by Home Base, Inc. in September and October of 2017 indicated that B.T. needed additional education in order to appropriately and effectively parent these children. Specifically, the parental fitness evaluation report notes that B.T. needed further education

---

[18] We note that the record before us appears to be incomplete, as there is no transcript of the dispositional hearing. And, as noted above, the guardian ad litem neither submitted a report nor conducted an investigation, either of which could have provided critical information.

14

with regard to consistency in parenting, developmental expectations, and disciplinary processes. The report also states that B.T. acknowledged that he was not in a position to reassume custody of the children when the evaluation was conducted, and that he would need the assistance of his mother. Nothing in the report indicates or suggests that B.T. lacked the capacity to parent these children, only that he needed improvement to do so effectively. And, the psychological evaluation conducted by Scott Spaulding on October 9, 2017, indicates no mental incapacity on B.T.'s part that would prevent him from caring for the children, though the report does recommend treatment for some generalized anxiety, depression, and concentration problems.

Moreover, the MDT reports contained in the appendix record summarize several of B.T.'s supervised visits with the children and his participation in services. Until May 2018, all of the MDT reports were positive regarding B.T.'s behavior around the children, his attentiveness to the children, and his relationship with the children. As an example, in the July 2017 MDT report, the provider noted that "[B.T.] demonstrates having a nurturing relationship with all three of his children" and that the supervised visit coordinator reported that "B.T. attends to the children's needs by himself, without a distraction of any outside entity[.]" In the same report, the provider comments that B.T. internalized that the uninhabitable condition of his home at the time of the filing of the petition was neglectful to the children, and notes that B.T. had attended and complied with all extended parenting services and adult life skills classes. The parental fitness evaluation confirmed the strength of B.T.'s bond with his children, and their reciprocal bond with him.

The evaluation also clearly noted that B.T. was appropriately attentive to the children, as, for example, he twice prevented them from consuming food from the floor.

Later reports state that "[B.T.] [is] demonstrating care and well-being of [the] children in a timely and efficient manner during visits . . . . [He] [is] [] attentive and protective of slight dangers that may arise such as jumping off the couch, climbing on a table, or attempting to leave the room." Yet another report indicates that B.T. was "engaged with all of [the] children" and that he attempted to work with the children's mother to discipline and provide for the children's needs. That report concluded that the parents were both compliant with services. As noted above, until May 2018, all of the reports are consistent about this, as B.T. was both compliant and apparently successful in parenting during the supervised visits.

In May 2018, the DHHR made its first request that this matter be set for disposition.[19] In the months following that motion, the tone of DHHR reports changed, alleging that B.T. apparently now lacked the ability to parent the children. In those reports, however, the DHHR pointed to only two isolated incidents in which B.T. allegedly demonstrated an apparent lack of ability to parent the children. The first was during a June 2018 visit in which a CPS worker observed that B.T. struggled to articulate to A.T.-1 that he needed to share a toy. The report detailing this visit also stated that "overall parenting functioning was at a deficit." The second incident occurred during a January 2019 visit

---

[19] We again note that disposition would have been inappropriate in May 2018 because B.T. still had not been adjudicated.

where A.T.-2 and N.T. evaded B.T. long enough to unplug a computer system in the supervised visitation center. The DHHR stated that the children's unplugging the computer indicated that B.T. was not attentive to their safety.[20]

We cannot but conclude that these incidents were isolated and not symptomatic of a larger parenting deficit. At oral argument, the DHHR could not point to a single other incident outside of these two apparently minor "infractions" over the lengthy course of these proceedings that would support a conclusion that B.T. lacked the ability to parent. Relating to the first incident, failing to articulate how to share a toy, without more, is hardly indicative of incapacity to parent. And, there is no evidence in the record to indicate this struggle was part of a larger pattern of inability to communicate effectively with the children, as it is only mentioned in one report during a chance drop-in by the CPS worker. As to the second incident, we are unable, based on the record before us, to establish any sort of pattern of behavior that would suggest that B.T. was inattentive to the safety of the children while in his care.

Rather, the record overwhelmingly supports the opposite conclusion: the vast majority of reports state that B.T. was appropriately attentive and protected the children from minor dangers like jumping from sofas and eating from the floor. Likewise, the contention that "overall parenting function was at a deficit" not only lacks any explanation or evidentiary support, but also inexplicably directly contradicts a multitude of prior

---

[20] When pressed at oral argument for more incidents that would indicate lack of capacity to parent, the DHHR failed to present even a single additional incident.

reports, and so we afford it scant merit. We decline to ignore *months* of positive reports based on these minor, isolated incidents, and so cannot find sufficient support for the conclusion that B.T. lacked an ability to parent or that his overall parenting function was at a deficit so as to terminate his parental rights.

As an aside, we note that the DHHR also placed some emphasis on the fact that B.T. missed a supervised visit with the children in February 2019. B.T. claimed he was ill and could not attend the visit, but was later seen attending a relative's wedding. While we do not approve of B.T.'s apparent lying in order to miss that particular visit, we also cannot ignore that this was the only such incident in nearly thirty months for which we can verify that B.T. intentionally caused a visit to be cancelled. That said, the record does not contain any information regarding the number of visits scheduled, and whether B.T. attended or missed those visits, between October 2017 and February 2019. The record does indicate that, as of October 2017, there had been forty-eight scheduled visits, but B.T. had attended only thirty-one of those visits. The record on that point further explains that those remaining seventeen visits were cancelled for various reasons, including that the children were sick, that the father had a medical emergency, and that the mother had entered into an inpatient drug rehabilitation program. Other parts of the record indicate that some visits were cancelled due to unforeseen weather.

Based on this, we have no evidence that B.T. caused any scheduled visit other than the one in February 2019 to be cancelled. We decline to hold it against B.T. that he had a medical emergency causing him to miss one of the visits prior to October 2017, and

18

we do not have any additional evidence on that point to determine the veracity of his excuse for missing that visit. Second, we are mindful that, at least since May 2017, at the foster parents' request the visits increased to one four-hour visit every other week, so there were many visits that took place as scheduled. It is rare for us to see a situation where the foster parents have requested an *increase* in the number of supervised visits between the parent and the children. The circuit court cannot focus all of its attention on a single supervised visit over a thirty-month period as a means to conclude that B.T. is unfit or incapable of parenting these children.

Turning to whether B.T. has corrected the allegations of abuse and neglect that led to the filing of the petition, we highlight the three separate motions to dismiss presented to the circuit court indicating that B.T. had not only obtained suitable housing, but also that he regained his full-time employment, left his relationship with the children's mother, and married a new spouse who was willing and capable of assisting him in parenting the children.[21] The DHHR and the guardian ad litem have failed to rebut any of these assertions, leading us to conclude that they must be accurate.

---

[21] The guardian ad litem took great issue with this framing at oral argument, emphatically stating that it was not the responsibility of the new spouse to assist in parenting these children. First, we disagree generally with the notion that B.T. is not permitted to seek assistance from his new spouse in caring for his children, as the parental fitness evaluation suggested he would benefit from such assistance. Second, we would remind the guardian ad litem that if he wished to express his opinion in this regard, he should have conducted an investigation of the new home and the new spouse and filed a written report to the circuit court. He failed to do either of these things.

The DHHR originally alleged that B.T.: (1) caused the children to live in an unsuitable environment due to the lack of appropriate space, cleanliness, and food; (2) engaged in domestic violence with the children's mother which endangered the children; (3) lacked knowledge of childhood development leading to the children's developmental delay; and (4) medically neglected A.T.-2 because he failed to seek treatment for her broken leg. Based on the various reports contained in the appendix record and the facts alleged in the motions to dismiss, B.T. corrected each and every one of these allegations by the time of the May 20, 2019, dispositional hearing. So, there is simply no basis for the circuit court's finding that there was no reasonable likelihood B.T. could correct the conditions that led to the filing of the abuse and neglect petition in the near future, as he had seemingly already corrected them. For similar reasons, the circuit court's finding that B.T. failed to follow through with appropriate services to correct the conditions of abuse or neglect is also unsupported by the record. As noted above, the appendix record indicates overwhelmingly that B.T. was in compliance with the extended services throughout these proceedings.[22]

In short, having reviewed the record before us, we are left with the distinct impression that a mistake has been made because the circuit court's findings are almost

---

[22] We are aware of the July 31, 2018, email from Home Base, Inc. which stated that the organization discontinued parenting and adult life skills classes due to the lack of progress. It is unclear from the record whether this pertained to both parents or to a single parent. Further, we are unable to determine what weight to afford this email as it does not indicate, nor does the surrounding record indicate, what is meant by the lack of progress. As noted above, the totality of the record indicates that progress was being made, at least on B.T.'s part.

entirely unsupported by the factual record. We have long held that we will set aside clearly erroneous findings, meaning findings which are supported by the record, but which leave us with the definite and firm conviction that a mistake has been made.[23] The circuit court's findings here are only supported by the record if one selectively focuses on minor negative incidents. The totality of the record suggests that B.T. is not only capable of parenting these children, but that he complied with the services afforded him and he corrected the conditions that led to filing of the petition by the time of disposition. As such, we conclude that the circuit court's findings were clearly erroneous and set them aside.

Because we conclude that the circuit court's findings relating to the substantive allegations upon which B.T.'s parental rights were terminated were clearly erroneous, we reverse the June 3, 2019 order of the Circuit Court of Kanawha County that terminated B.T.'s parental rights. We remand this matter to the circuit court for a new dispositional hearing consistent with this opinion.[24]

---

[23] *See* Syl. Pt. 1, in part, *In the Interest of Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 ("[Factual findings of the circuit court] shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that mistake has been committed.").

[24] While our observations in this opinion clearly show why we must reverse and remand the circuit court's dispositional order, we do not dictate how the circuit court is to rule on remand. The circuit court is directed to hold a new dispositional hearing where the parties may present any and all evidence relevant to disposition. Moreover, the guardian ad litem is directed to timely file his report prior to the new dispositional hearing.

## IV.  CONCLUSION

For these reasons, we reverse the June 3, 2019 order of the Circuit Court of Kanawha County that terminated B.T.'s parental rights and remand for a new dispositional hearing consistent with this opinion.

Reversed and remanded.