**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**


*In re* **R.W.**

**No. 21-0525** (Braxton County 21-JA-9)


**MEMORANDUM DECISION**


Petitioner Mother D.H., by counsel Daniel K. Armstrong, appeals the Circuit Court of Braxton County's June 2, 2021, order adjudicating her as an abusive and neglectful parent in regard to R.W.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem, Julia R. Callaghan, filed a response on behalf of the child in support of the circuit court's order and a supplemental appendix. On appeal, petitioner argues that the circuit court erred in adjudicating her as an abusing parent.[2]

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In February of 2021, the DHHR filed an abuse and neglect petition alleging that petitioner failed to protect three-year-old K.H. who was found unresponsive in his father's home and later was pronounced dead at a local hospital. The DHHR alleged that then one-year-old R.W. was in the home at the time of his sibling's death. According to the petition, petitioner moved out of the

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]Subsequent to the order on appeal, petitioner's parental rights to the child were terminated by order entered on July 6, 2021. Petitioner does not, however, assign error on appeal in regard to the termination.

father's home and did not live in the residence at the time of K.H.'s death. The DHHR further alleged that the children's maternal grandfather regularly cared for both children, despite the involuntary termination of his parental rights to his own children—including petitioner. The DHHR also alleged that petitioner engaged in domestic violence in front of the children with the father. The DHHR alleged that petitioner allowed the father to care for the children despite his violent tendencies and after she had filed a domestic violence petition against him. Finally, the DHHR alleged that the father was charged with death of a child as a result of child abuse and child neglect resulting in death, both felony offenses.

Later that month, the circuit court held a preliminary hearing. The court ordered that petitioner pay child support and undergo psychological, parental fitness, and substance abuse evaluations. Petitioner was also ordered to obtain full-time employment and suitable housing and was granted supervised visitation with the child.

In March of 2021, the DHHR filed an amended petition setting forth additional details concerning domestic violence between petitioner and the father. According to the amended petition, petitioner reported to the West Virginia State Police that the father had smacked the deceased child's buttocks too hard on at least one occasion, leading to a domestic altercation between the parents. The DHHR alleged that petitioner disclosed that all of the physical altercations between her and the father were the result of him being too aggressive toward the children. The next month, the DHHR filed a second amended petition alleging that the father left the children unattended in the home; it also detailed additional incidents of domestic violence between petitioner and the father.

The circuit court held an adjudicatory hearing in May of 2021 wherein petitioner testified that there were ten to twelve incidents of domestic violence between her and the father in the two years that they were in a relationship. Petitioner acknowledged that some of these incidents occurred in front of the children. Petitioner stated that the most recent incident occurred in November of 2020, approximately two-and-a-half months before the father was charged in the death of three-year-old K.H. Petitioner testified that she sought a protective order after the incident but acknowledged that the order was later dismissed after she failed to appear for the hearing. During her testimony, petitioner admitted that, on at least one occasion, she witnessed the father smacking K.H. "too hard," which led to a physical altercation between the parents in front of the children. Petitioner also testified that the father became angry and violent when he heard loud noises, including noises made by the children. Petitioner explained that the father blamed his violent behavior on an apparition purportedly named "Fire Face," which he claimed appeared to him in the trailer park where he resided. Next, the DHHR entered into evidence petitioner's recorded interview with law enforcement officials after K.H.'s death. In the recorded interview, petitioner stated that she spoke to the father at 11:00 pm the night before K.H.'s death, at which point he informed her that K.H. had told him that "Fire Face" was going to make him "kill them all." Despite this testimony, petitioner testified that she thought the children were safe in the father's care. Petitioner also admitted that she regularly left the children in the care of the grandfather, whose parental rights to his children had been terminated, and claimed that she did not understand that he was not permitted to supervise the children. Finally, petitioner testified that

2

she did not inform a Child Protective Services ("CPS") worker that she had witnessed the father using drugs.

Next, a doctor testified as to medical records and photographs of K.H. from a local hospital. According to the doctor, no pulse was ever detected after the child was brought to the hospital. The doctor explained that K.H.'s rectal temperature upon his arrival to the hospital was 89.6º Fahrenheit while the normal rectal temperature for a child is approximately 100º Fahrenheit. The doctor explained that a dead body loses approximately 1.5º Fahrenheit per hour in a room temperature climate. As a result, the doctor estimated that K.H. had been deceased for approximately three to five hours before arriving at the hospital. According to the doctor, the child's ears, mouth, nose, and body were bruised and swollen upon arrival to the hospital. The doctor noted that he could not open the child's mouth or left eye, and the right eye was fixed and dilated. He further explained that there was air in the child's brain, the second and third cervical vertebra were displaced three millimeters, and there was air in both chest cavities and outside the lungs. The doctor testified that he had never seen injuries like this from CPR, only from child abuse, severe trauma, and car accidents. The doctor noted that several of the child's injuries could have been fatal in and of themselves, and opined that the injuries to K.H. were a result of severe child abuse.

Finally, a CPS worker testified that she investigated K.H.'s death and found that only the father and R.W. were present at the time of K.H.'s death. The worker testified that after interviewing the doctor and reviewing medical records of K.H.'s death, she filed the instant abuse and neglect petition. The worker testified that petitioner failed to protect the children because she placed the children in a domestic violence environment and allowed the father, who had violent tendencies, to supervise the children. The worker noted that petitioner's decision to allow the children's grandfather to supervise the children was concerning, as well. The worker also contradicted testimony from petitioner that she never witnessed the father abuse controlled substances.

After hearing the evidence, the circuit court found the testimony of the CPS worker and doctor to be credible, while petitioner's testimony was incredible. The court found that petitioner consistently denied all allegations of wrongdoing or abuse and neglect. The court further found that petitioner and the father committed ten to twelve acts of domestic violence in the presence of the children. Based on the evidence, the court found that the DHHR established by clear and convincing evidence that petitioner abused and neglected the children.[3] It is from the adjudicatory order that petitioner appeals.

The Court has previously established the following standard of review:

---

[3]During a later-held dispositional hearing, petitioner's parental rights to R.W. were terminated. The father's parental rights were also terminated below. According to the parties, the child's permanency plan is adoption by his current foster parents.

3

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

All of petitioner's assignments of error concern the circuit court's adjudication of her as an abusing and neglectful parent. First, petitioner argues that the circuit court erred in adjudicating her as an abusing parent based on her decision to allow the children's grandfather to supervise the children. Petitioner argues that the DHHR failed to call a single witness who testified that petitioner was ever informed that she could not allow the grandfather to supervise the children. She contends that no one explained any terms or conditions related to the grandfather's prior termination of parental rights to his own children and that there was no evidence that she had any knowledge that his prior termination of parental rights should have impacted his fitness to supervise the children. We disagree.

We have previously held as follows:

At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected . . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id*. at 546, 759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* (citation omitted). Further, West Virginia Code § 49-1-201 defines "abused child" as

[a] child whose health or welfare is being *harmed or threatened by* . . . [a] parent . . . who knowingly or intentionally inflicts, attempts to inflict, or knowingly allows

4

another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home.

(Emphasis added).

Having reviewed the record, we find that sufficient evidence existed to adjudicate petitioner as an abusing parent. While petitioner claims that she did not know that the grandfather could not supervise the children, she does not dispute having knowledge that his parental rights were previously terminated. Further, her testimony reflects that she understood that the grandfather had been found by a circuit court to be unsafe to parent his children—including her. Nevertheless, petitioner chose to allow the grandfather to serve as a caregiver for her children on a regular basis, based upon a personal assessment that he had changed. Although there is no evidence that the grandfather perpetrated acts of abuse or neglect against petitioner's children, petitioner's choice to place the children in her father's care, despite his history of abuse and neglect, threatened the children's safety and wellbeing. As noted above, West Virginia Code § 49-1-201 defines an "abused child" as one whose "health or welfare is harmed or threatened" by abuse and neglect. As such, the DHHR was not required to prove that the grandfather actually perpetrated abuse or neglect against the children. Further, the DHHR was not required to put on evidence that petitioner had knowledge of the terms and conditions of the grandfather's prior termination of parental rights. Rather, the DHHR demonstrated, by clear and convincing evidence, that petitioner knew or should have known that the grandfather was an inappropriate caregiver for the children. Consequently, the circuit court did not err in adjudicating petitioner based upon allowing the grandfather to provide care for the children when she knew that his prior termination of parental rights placed the children at risk for abuse and neglect.

Next, petitioner argues that the circuit court erred in adjudicating her based upon exposure of the children to domestic violence. Petitioner contends that she had taken several steps to remove the children from the toxic environment several months prior to K.H.'s death. She notes that the father was undergoing mental health treatment, and only after he began treatment did she begin to allow the father to engage in supervised visits with the children for hours at a time. Petitioner also notes that she moved out of the father's residence in November of 2020, after which there were no incidents of domestic violence. As such, petitioner argues that she was not exposing R.W. to domestic violence when the instant petition was filed in February of 2021. We find petitioner's arguments without merit.

Petitioner's arguments in support of this assignment of error are predicated on her assertion that the circuit court erroneously weighed the evidence in question. However, the rulings to which petitioner cites all come down to the issue of credibility, and as this Court has long held, "[a] reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997).

First, petitioner attacks the circuit court's findings that acts of domestic violence committed between petitioner and the father as recently as November of 2020 could serve as valid grounds

5

for adjudication of abuse and neglect of the children based on a petition filed in February of 2021. Petitioner argues that a CPS worker who testified was unable to articulate any remedial action that petitioner could have taken between November of 2020 and January of 2021, when she began to allow visitation with the children. However, petitioner ignores the fact that she filed for a protective order against the father following an incident of domestic violence in November of 2020. That protective order was later dismissed after petitioner failed to appear and present evidence in support of her petition. Further, while petitioner separated herself from the father by moving out of the shared residence, she continually allowed him to have regular contact with the children—including unsupervised contact for extended periods of time. Petitioner allowed the father to supervise the children, despite knowing his propensity for violence against her and the children. Indeed, petitioner admitted at the adjudicatory hearing that the father engaged in at least ten to twelve incidents of domestic violence in the course of their two-year relationship, including many incidents in front of the children. Therefore, the children remained at risk of future harm from exposure to domestic violence and as potential victims of the father's violence. Accordingly, we find no error in the circuit court's adjudication of petitioner based upon domestic violence.

Finally, petitioner argues that the circuit court erred in adjudicating her based on her failure to admit any wrongdoing or culpability. Petitioner notes that the DHHR has the burden of proof, under West Virginia Code § 49-4-601(i), to prove conditions of abuse and neglect by clear and convincing evidence. Petitioner contends that the circuit court shifted the burden of proof onto her by finding that she failed to take any responsibility for the death of K.H. as to the finding of abuse for R.W. We find petitioner's arguments unavailing.

Here, while recognizing that "[t]he burden of proof in a child neglect or abuse case does not shift from the State Department of [Health and Human Resources] to the parent, guardian or custodian of the child," we nonetheless find that such shifting did not occur below. Syl. Pt. 4, in part, *In re K.L.*, 233 W. Va. 547, 759 S.E.2d 778 (2014) (citation omitted). As set forth above, the DHHR presented overwhelming evidence that petitioner knew or should have known that the father was not a safe caregiver for the children. Petitioner testified that the father committed several acts of domestic violence in the presence of the children, had anger management issues, and had violent tendencies. Further, petitioner admitted that on at least one occasion, the father smacked K.H., in her own words, "too hard." Petitioner further testified that mere loud noises, including from the children, caused the father to become angry and violent. Petitioner also documented that the father failed to take responsibility for domestic violence in their relationship, blaming many incidents on an apparition which he named "Fire Face." Petitioner also allowed the children's grandfather, whose parental rights were previously terminated, to supervise the children and minimized her actions by claiming that she did not "know" that he should not be around the children. Thus, while the circuit court did find that petitioner "denied any wrongdoing" during the proceedings, there is no evidence that the court used petitioner's lack of admission to abuse and neglect as a basis for her adjudication.

In sum, the evidence presented below was sufficient to demonstrate that petitioner abused and/or neglected R.W. Therefore, we find no error in the circuit court's adjudication of petitioner as an abusing parent. Petitioner is entitled to no relief.

For the foregoing reasons, we find no error in the decision of the circuit court, and its June 2, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: January 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton