**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **N.B.**

**No. 20-0652** (Mercer County 20-JA-108)

**MEMORANDUM DECISION**

Petitioner Father J.B., by counsel David B. Kelley, appeals the Circuit Court of Mercer County's July 15, 2021, order terminating his parental rights to N.B.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Brittany Ryers-Hindbaugh, filed a response in support of the circuit court's order. The guardian ad litem, Patricia Kinder Beavers, filed a response on behalf of the child also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing parent and terminating his parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Prior to the filing of the instant petition, the DHHR filed a child abuse and neglect petition against the parents in 2018. The parents were adjudicated as abusing parents and were granted post-adjudicatory improvement periods. The mother failed to address the conditions of abuse and neglect and her parental rights to the child were terminated in October of 2019. Petitioner, however, successfully completed his improvement period, and the petition against him was dismissed. Around October of 2019, petitioner entered into a custody agreement with his former stepsister, A.L., wherein they agreed to share custody of the child.[2]

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

[2]Although unclear from the record, it appears that this agreement might have been reached as a part of the disposition entered in the case.

In October of 2020, A.L.'s mother retrieved the child from petitioner's care after a three-day visit. Thereafter, A.L. and her mother observed the child to be bleeding from the rectum and took him to a hospital for medical treatment. Medical personnel asked A.L. whether there was any possibility of sexual abuse, and A.L. responded that she did not believe so. The medical personnel did not find that the child had been sexually abused but recommended that A.L. contact Child Protective Services ("CPS") regarding the child's condition. The next day, A.L. took the child to Charleston Area Medical Center ("CAMC") for another medical examination to determine whether the child had been sexually abused. CAMC would not advise A.L. of the results of the examination but advised her to seek emergency custody of the child. A.L. filed for emergency custody of the child, but it was not granted because she was unable to serve petitioner.

A.L. spoke to a CPS worker regarding her concerns of the child's condition, including her attempts to take him for treatment due to his bleeding from the rectum. A.L. reported that petitioner was "best friends with a neighbor that was a sex offender" and that he allowed the neighbor to babysit the child. A.L. also noted that petitioner did not go to either hospital while the child was being treated and that petitioner claimed the coloration in the child's diaper was not blood but was residual food dye from red soda and red snacks that the child ingested while in his care. A.L. further advised that petitioner's home was filthy and infested with cockroaches and that petitioner failed to contribute to the care of the child.

Following an interview with A.L., the CPS worker attempted to contact petitioner multiple times, both in person and by phone, but petitioner did not respond to the worker's attempts. As such, the CPS worker filed the instant child abuse and neglect petition, raising the above-mentioned allegations. Petitioner appeared at his preliminary hearing and was informed of how to maintain contact with the DHHR and his attorney.

After a continuance due to petitioner's counsel's attempt to locate petitioner, the circuit court held an adjudicatory hearing in April of 2021. Petitioner failed to appear but was represented by counsel. A trooper with the West Virginia State Police testified that he initiated an investigation into possible sexual abuse of the child after a copy of the petition was forwarded to his office. The trooper obtained a search warrant and executed a search of petitioner's home. The trooper described deplorable conditions in the home, with piles of trash and dog feces throughout, including in the bedroom containing the child's crib. The trooper further stated that there were cockroaches everywhere, that there was no food in the home, and that chemicals were left on the floor and easily within reach of a child. The trooper testified that the child's high chair was covered in cockroach feces and his crib was piled full with trash, household items, dog feces, and cockroaches. According to the trooper, he spoke to petitioner regarding the allegations, and petitioner claimed he did not see any blood in the child's diaper. Petitioner told the trooper that he fed the child "hot fries, red [F]anta soda, red [B]risk tea, [and] sweet tea from Bob Evan[s]" and attributed the red substance in the child's diaper to these foods and drinks. Petitioner gave the trooper various explanations as to why he did not accompany the child to the hospital, including that he could not leave his place of employment and that he did not have enough money for gas. The trooper testified that, when asked regarding the condition of the home, petitioner explained that his mental health issues prohibited him from maintaining the home sufficiently and that the home had been in its current state for at least three and a half months.

2

A CPS worker testified that he spoke to A.L. regarding her concerns of possible abuse and neglect of the child. The CPS worker stated that A.L. observed the child's diapers to be bloody following time spent with petitioner and that she took him to the hospital twice to be examined. According to the CPS worker, petitioner never went to the hospital to check on the child or inquire about him. The CPS worker admitted that neither hospital had made findings of sexual abuse. However, the CPS worker stated that he spoke to petitioner, who acknowledged that he allowed his friend to babysit the child, and further investigation demonstrated that the friend was, in fact, a registered sex offender. Moreover, the CPS worker stated that petitioner made comments about having a demon named "Shadow" in his mind that spoke to him and demanded human sacrifice. Regarding the conditions of the home, the CPS worker noted that he made an appointment with petitioner to see the home and that, when the worker arrived, it was obvious that petitioner had made efforts to clean the home as evidenced by the strong odor of cleaning products. The CPS worker testified that, as a result of petitioner's efforts to clean, carpet had been pulled up in the child's bedroom. Piles of trash remained in the home, however.

A.L. testified that she frequently cared for the child and financially supported him, and that petitioner failed to do so. A.L. stated that petitioner knowingly allowed a registered sex offender to babysit the child. She further testified that the living conditions in his home were poor and that she had observed trash, cockroaches, and dog feces in the home. A.L. testified that, in addition to observing blood in the child's diaper, the child "scream[ed] and cr[ied] saying that his butt hurt." A.L. stated that she advised petitioner that she was taking the child to the hospital and offered to pick him up but that he never came to the hospital and did not contact her for two days.

Following testimony, the circuit court adjudicated petitioner as an abusing parent, finding that he failed to maintain food in his residence for the child, that the home conditions were horrible, and that he failed to obtain medical care for the child.

In July of 2021, the circuit court held a dispositional hearing and incorporated the testimony presented at the adjudicatory hearing. Petitioner's counsel requested a continuance because petitioner had not met with him. The DHHR objected, stating that petitioner kept in contact at the beginning of the proceedings but thereafter absented himself. The circuit court denied the continuance but allowed petitioner and his counsel to meet for a few minutes before proceeding to disposition. Petitioner testified and again requested a continuance, stating that he was "trying to get [himself] back on [his] feet." Petitioner stated that he had "been bouncing around from house to house" and was trying to find a job. Petitioner acknowledged that he had been in contact with the DHHR and his counsel at the beginning of the proceedings and further conceded that he understood how abuse and neglect proceedings worked given his prior involvement.

The DHHR presented the testimony of a CPS worker, who stated that petitioner had not maintained contact with her since prior to December of 2020. The CPS worker testified that she attempted to reach petitioner both at his home and via phone to no avail. The CPS worker opined that

> [w]ith the lack of contact or willingness or inability to make efforts to contact the [DHHR] or even call the [DHHR's] number to get in contact and inquire about his

case and his son, I do not see at this point with it being seven months out that and no efforts made on his behalf that there would be any substantial circumstance change in the near future.

As such, the CPS worker stated the DHHR was recommending the termination of petitioner's parental rights.

After testimony, the circuit court found that petitioner "simply has not participated in regard to efforts made by the [DHHR]" and knew how the proceedings worked but made no effort to appear. The circuit court found that petitioner failed to complete a case plan and further found that there was no reasonable likelihood that he could correct the conditions of abuse and neglect in the near future and that termination was necessary for the child's welfare. Accordingly, the circuit court terminated petitioner's parental rights to the child. Petitioner appeals the circuit court's July 15, 2021, dispositional order.[3]

The Court has previously established the following standard of review in cases such as this:

"Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in adjudicating him as an abusing parent and terminating his parental rights. Petitioner attacks the allegations against him and argues that they were insufficient to support either adjudication or disposition. Petitioner contends that the allegations of sexual abuse were not supported by either witness testimony or medical records. As such, he argues, there was no clear and convincing evidence that the child had been sexually abused. Furthermore, petitioner claims that "if one assumes that the allegation of 'improper supervision was based upon the mistaken belief of sexual abuse, then no 'clear and convincing' evidence of improper supervision was offered at the adjudication." Petitioner argues that the medical records demonstrated that the child was well-nourished and that he was, as described in the records, "active, playful and energetic." While petitioner concedes that the soft drinks and snacks he fed the child were not an ideal diet and might have led to temporary gastrointestinal

---

[3]As noted above, the mother's parental rights were previously terminated. The permanency plan for the child is adoption by A.L.

issues, he argues that they did not cause long-term health concerns. The rectal bleeding was described as "acute" and had been occurring for only one day. Further, testimony demonstrated that petitioner was unable to maintain adequate living conditions due to his mental health issues. Lastly, petitioner notes that he testified to his love for the child and his attempts to find housing and employment. Given what petitioner characterizes as the insufficiency of the evidence against him, he avers that his adjudication was error. Alternatively, petitioner claims that the circuit court could have employed a less-restrictive alternative disposition to the termination of his parental rights, especially considering that he was already sharing custody of the child with A.L. We disagree.

> We have previously held as follows:

> At the conclusion of the adjudicatory hearing, the court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. . . . The findings must be based upon conditions existing at the time of the filing of the petition and proven by clear and convincing evidence.

*In re F.S.*, 233 W. Va. 538, 544, 759 S.E.2d 769, 775 (2014). This Court has explained that "'clear and convincing' is the measure or degree of proof that will produce in the mind of the factfinder a firm belief or conviction as to the allegations sought to be established." *Id.* at 546, 759 S.E.2d at 777 (citation omitted). However, "the clear and convincing standard is 'intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.'" *Id.* at 546, 759 S.E.2d at 777 (citation omitted).

We conclude that the circuit court was presented with sufficient evidence to find that petitioner abused and/or neglected N.B. Petitioner ignores much of the evidence presented at the adjudicatory hearing, including that he failed to maintain adequate living conditions, knowingly permitted a registered sex offender to babysit the child, failed to seek medical treatment for the child's bleeding rectum, and failed to go to the hospital once A.L. sought treatment for the child. The trooper described petitioner's home as being filled with trash, cockroaches, and dog feces. Specifically, the child's crib was piled full of trash, household items, dog feces, and cockroaches, and his high chair was covered in cockroach feces. While petitioner blames his inability to maintain the home on his mental health issues, he failed to present any evidence of a diagnosis or that he was seeking treatment for his mental health issues. This is particularly concerning given petitioner's claims of being possessed by a demon named "Shadow." Further, A.L. testified that petitioner knowingly allowed a registered sex offender to babysit the child, and the CPS worker testified that petitioner acknowledged to him that he permitted the sex offender to watch the child. Contrary to petitioner's claims, a finding of sexual abuse is not necessary to support a finding of improper supervision. Clearly, the child was at risk while being supervised by the registered sex offender. Moreover, although no finding of sexual abuse was made, the record is clear that the child was suffering from a bleeding rectum, that petitioner denied the symptoms and did not seek medical treatment of the child, and that petitioner did not go to the hospital to check on the child despite A.L.'s offer of transportation. Accordingly, we find that the circuit court's findings are supported by the evidence and, consequently, we find no error in the circuit court's adjudication of petitioner as an abusing parent.

We likewise find no error in the circuit court's termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) provides that circuit courts are to terminate parental rights upon finding that there is "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the child's welfare. Pursuant to West Virginia Code § 49-4-604(c), "'[n]o reasonable likelihood that conditions of neglect or abuse can be substantially corrected' means that . . . the abusing adult . . . [has] demonstrated an inadequate capacity to solve the problems of abuse or neglect on their own or with help."

The record establishes that petitioner demonstrated an inadequate capacity to solve the problems of abuse and neglect on his own or with help. Prior to the instant proceedings, petitioner was the subject of other child abuse and neglect proceedings and was adjudicated as an abusing parent. Petitioner participated in an improvement period, which he successfully completed, and regained custody of the child. Approximately one year later, the instant proceedings were initiated. Petitioner admitted that he understood the process given his prior participation and initially maintained contact with his counsel and the DHHR; however, he subsequently absented himself from the proceedings and failed to maintain contact with the DHHR and his counsel. At least one continuance was granted in order for petitioner to appear and participate in the proceedings, but he failed to do so. As such, the record is void of any efforts made by petitioner to address the conditions of abuse and neglect that led to the petition's filing. Petitioner was well aware of what he needed to do to regain custody of the child given his participation in the prior case, but he simply refused to participate in the instant case. While petitioner claims that he needed more time to comply or that he should have been granted a less-restrictive alternative to the termination of his parental rights, this Court has held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). As set forth above, petitioner failed to take any steps towards remedying the conditions of abuse or neglect. Accordingly, we find no error in the circuit court's finding that there was no reasonable likelihood petitioner could substantially correct the conditions of abuse and neglect and that termination was necessary for the child's welfare. Based on these findings, termination of petitioner's parental rights, as opposed to a less-restrictive dispositional alternative, was appropriate.

For the foregoing reasons, we find no error in the decision of the circuit court, and its July 15, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: February 1, 2022


**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice Evan H. Jenkins
Justice William R. Wooton